# RADZANOWER *v.* TOUCHE ROSS & CO. ET AL.

No. 75–268.   Argued March 30, 1976—Decided June 7, 1976

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 158.

*Ira Jay Sands* argued the cause for petitioners. With him on the briefs was *Samuel Gottlieb.*

*Samuel E. Gates* argued the cause for respondent. With him on the briefs was *Richard I. Janvey.*†

MR. JUSTICE STEWART delivered the opinion of the Court.

This case requires us to determine which venue provision controls in the event a national banking association is sued in a federal court for allegedly violating the Securities Exchange Act of 1934: the broad venue provision of the Securities Exchange Act, which allows suits under that Act to be brought in any district where the defendant may be found, or the narrow venue provision of the National Bank Act, which allows national

———

†*David Ferber* and *David J. Romanski* filed a brief for the Securities and Exchange Commission as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *C. Westbrook Murphy* for the Comptroller of the Currency; by *William Eldred Jackson* and *Briscoe R. Smith* for the Chase Manhattan Bank; and by *Donald J. Yellon* and *William B. Davenport* for the First National Bank of Chicago.

banking associations to be sued only in the district where they are established.

The petitioner, Hyman Radzanower, instituted a class action in the District Court for the Southern District of New York alleging, *inter alia,* that the respondent, First National Bank of Boston, a national banking association with its principal office in Boston, Mass., had violated the federal securities laws by failing to disclose to the Securities and Exchange Commission and the investing public its knowledge of certain adverse financial information about one of its customers, the TelePrompter Corporation, and of securities laws violations by that company. The complaint alleged that venue was proper under § 27 of the Securities Exchange Act of 1934, 48 Stat. 902, 15 U. S. C. § 78aa, which provides that "[a]ny suit or action to enforce any liability or duty created [by or under the Securities Exchange Act] . . . may be brought in any such district [wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is found or is an inhabitant or transacts business . . . ." The bank moved to dismiss the complaint as to it, asserting that venue as to it lay only under the venue provision of the National Bank Act, Rev. Stat. § 5198 (1878), 12 U. S. C. § 94. That section provides that "[a]ctions and proceedings against any [national banking] association under this chapter may be had in any district or Territorial court of the United States held within the district in which such association may be established . . . ." [1]

---

[1] Section 94 in its entirety reads:

"Actions and proceedings against any association under this chapter may be had in any district or Territorial court of the United States held within the district in which such association may be established, or in any State, county, or municipal court in the county

Following the settled law of the Second Circuit, the District Court granted the bank's motion to dismiss. It held that "[a]bsent waiver or consent, a national bank may be sued only in the district in which it is established. 12 U. S. C. Section 94." The court noted that the bank was established in Boston "because its charter specifies Boston as its principal place of business," [2] and it rejected the petitioner's claim that the bank had waived the provisions of § 94.[3] The Court of Appeals affirmed without opinion.[4] Because of differing views in the Circuits as to the statutory venue question presented,[5] we granted the petition for certiorari. 423 U. S. 911.

---

or city in which said association is located having jurisdiction in similar cases."

[2] The petitioner does not claim that the bank is "established" anywhere else than in Boston. Federal courts have consistently ruled that the place specified in a bank's charter as its home office is determinative of the district in which the bank is "established" for purposes of § 94. See, e. g., Buffum v. Chase Nat. Bank, 192 F. 2d 58, 60 (CA7); Leonardi v. Chase Nat. Bank, 81 F. 2d 19, 22 (CA2).

[3] The opinion of the District Court is unreported.

It has long been settled that the restrictive venue provisions of § 94 can be waived by a defendant bank. See, e. g., Charlotte Nat. Bank v. Morgan, 132 U. S. 141, 145; Michigan Nat. Bank v. Robertson, 372 U. S. 591, 594; National Bank v. Associates of Obstetrics, 425 U. S. 460.

Although the parties each devoted a portion of their briefs to the waiver issue, that issue was not raised in the petition for certiorari. Since we consider "[o]nly the questions set forth in the petition or fairly comprised therein," this Court's Rule 23 (1) (c), we have no occasion to pass on the correctness of the decisions below on the waiver question.

[4] The judgment of the Court of Appeals is reported at 516 F. 2d 896.

[5] The Second and Ninth Circuits have concluded that § 94 is the exclusive venue provision governing suits against national banking associations, while the Third Circuit has ruled that such suits may

Section 94 provides that suits against a national banking association "may be had" in the federal district court for the district where such association is established. The Court has held that this grant of venue is mandatory and exclusive: "The phrase 'suits . . . may be had' was, in every respect, appropriate language for the purpose of specifying the precise courts in which Congress consented to have national banks subject to suit and we believe Congress intended that in those courts alone could a national bank be sued against its will." *Mercantile Nat. Bank* v. *Langdeau,* 371 U. S. 555, 560. Accord, *Michigan Nat. Bank* v. *Robertson,* 372 U. S. 591; *National Bank* v. *Associates of Obstetrics,* 425 U. S. 460.[6] The venue provision of the Securities Exchange Act, by contrast, allows suits under that Act to be brought anywhere that the Act is violated or a defendant does business or can otherwise be found. It is the petitioner's contention that when a national bank is named as a defendant in a suit brought under the Securities Exchange Act, it loses the protection of the venue provisions of § 94 and may be sued in any federal judicial district where that Act was violated or where it does

---

also be brought pursuant to § 27 of the Securities Exchange Act. Compare *Bruns, Nordeman & Co.* v. *American Nat. Bank,* 394 F. 2d 300 (CA2), and *United States Nat. Bank* v. *Hill,* 434 F. 2d 1019 (CA9), with *Ronson Corp.* v. *Liquifin Aktiengesellschaft,* 483 F. 2d 852 (CA3).

[6] When the *Langdeau* Court held that the words "may be had" serve to provide mandatory and exclusive venue, it was dealing with the relationship of § 94 to a state venue statute. Since the same words are used in connection with the federal-court venue provision, the same construction is virtually inescapable. "[I]t would indeed strain language to say that the same verbs were merely permissive with respect to suits in federal courts although prohibitory as to actions in state ones." *Bruns, Nordeman & Co.* v. *American Nat. Bank, supra,* at 303.

business or can be found. For the reasons that follow, we cannot accept that contention.

It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton* v. *Mancari*, 417 U. S. 535, 550–551.[7] "The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at all." T. Sedgwick, The Interpretation and Construction of Statutory and Constitutional Law 98 (2d ed. 1874).[8]

When Congress enacted the narrow venue provisions of the National Bank Act, it was focusing on the particularized problems of national banks that might be sued in the state or federal courts. When, 70 years later,

---

[7] See *Brown* v. *GSA*, 425 U. S. 820; *Bulova Watch Co.* v. *United States*, 365 U. S. 753, 758; *Rodgers* v. *United States*, 185 U. S. 83, 87–89 ("It is a canon of statutory construction that a later statute, general in its terms and not expressly repealing a prior special statute, will ordinarily not affect the special provisions of such earlier statute"); *Ex parte Crow Dog*, 109 U. S. 556, 570–571. See also *Fourco Glass Co.* v. *Transmirra Products Corp.*, 353 U. S. 222; *Stonite Products Co.* v. *Melvin Lloyd Co.*, 315 U. S. 561 (specific venue statutes for patent suits prevail over general venue statutes).

[8] See also 1A J. Sutherland, Statutes and Statutory Construction § 23.15 (4th ed. C. Sands 1972).

Congress enacted the Securities Exchange Act, its focus was on the objective of promoting fair dealing in the securities markets, and it enacted a general venue provision applicable to the broad universe of potential defendants subject to the prohibitions of that Act. Thus, unless a "clear intention otherwise" can be discerned, the principle of statutory construction discussed above counsels that the specific venue provisions of § 94 are applicable to the respondent bank in this case. *Fourco Glass Co.* v. *Transmirra Products Corp.*, 353 U. S. 222.

The issue thus boils down to whether a "clear intention otherwise" can be discovered—whether, in short, it can be fairly concluded that the venue provision of the Securities Exchange Act operated as a *pro tanto* repeal of § 94. "It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored." *United States* v. *United Continental Tuna Corp.*, 425 U. S. 164, 168.[9] There are, however,

> "two well-settled categories of repeals by implication—(1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest . . . ." *Posadas* v. *National City Bank*, 296 U. S. 497, 503.

It is evident that the "two acts" in this case fall into neither of those categories.

---

[9] See also *Gordon* v. *New York Stock Exchange*, 422 U. S. 659, 682; *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 133; *Silver* v. *New York Stock Exchange*, 373 U. S. 341, 357; *United States* v. *Borden Co.*, 308 U. S. 188, 198–199.

The statutory provisions at issue here cannot be said to be in "irreconcilable conflict" in the sense that there is a positive repugnancy between them or that they cannot mutually coexist. It is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem. Rather, "when two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Morton* v. *Mancari, supra,* at 551. As the Court put the matter in discussing the interrelationship of the antitrust laws and the securities laws: "Repeal is to be regarded as implied only if necessary to make the [later enacted law] work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of the two statutory schemes." *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 357.[10]

Here the basic purposes of the Securities Exchange Act can be fairly served by giving full effect to the provisions of 12 U. S. C. § 94. The primary purpose of the Securities Exchange Act was not to regulate the activities of national banks as such but "[t]o provide fair and honest mechanisms for the pricing of securities [and] to assure that dealing in securities is fair and without undue preferences or advantages among investors . . . ." H. R. Rep. No. 94-229, p. 91 (1975).[11]

---

[10] See also *Gordon* v. *New York Stock Exchange, supra,* at 685; *United States* v. *National Assn. of Securities Dealers,* 422 U. S. 694, 734-735.

[11] The legislative history of the Securities Acts does not indicate that Congress considered banks as likely defendants in actions brought under those Acts. While Congress did examine problems stemming from the relationship of banks and the securities business in the early 1930's, see S. Rep. No. 1455, 73d Cong., 2d Sess. (1934), it dealt with those problems in comprehensive legislation dealing only with banks. See Banking Act of 1933, 48 Stat. 162. See generally *Investment Co. Institute* v. *Camp,* 401 U. S. 617.

Its venue provision, § 27, was intended to facilitate that goal by enabling suits to enforce rights created by the Act to be brought wherever a defendant could be found. The venue provision of the National Bank Act, § 94, was intended, on the other hand, "for the convenience of those [banking] institutions, and to prevent interruption in their business that might result from their books being sent to distant counties . . . ." *Charlotte Nat. Bank* v. *Morgan,* 132 U. S. 141, 145, quoted in *Mercantile Nat. Bank* v. *Langdeau,* 371 U. S., at 561–562, n. 12.

By allowing suits against national banks to be brought only pursuant to § 94, the purposes of that section will obviously be served. Yet application of § 94 will not "unduly interfere" with the operation of the Securities Exchange Act. See *Gordon* v. *New York Stock Exchange,* 422 U. S. 659, 686. Section 94 will have no impact whatever upon the vast majority of lawsuits brought under that Act. In the tiny fraction of litigation where its effect will be felt, it will foreclose nobody from invoking the Act's provisions. Members of the investing public will still be free to bring actions against national banks under the Act. While suits against this narrow and infrequent category of defendants will have to be brought where the defendant is established, that is hardly an insurmountable burden in this day of easy and rapid transportation.[12] Since it is possible for the statutes to coexist in this manner, they are not so repugnant

---

[12] The SEC has suggested that its enforcement activity under the Securities Exchange Act will be hindered in cases of securities law violations by geographically dispersed banks, if it cannot sue all defendants, including the banks, in one proceeding. The SEC, however, was unable to cite a single instance in the last 40 years where this situation has arisen. In any event, policy arguments such as this are more appropriately addressed to Congress than to this Court. See *Mercantile Nat. Bank* v. *Langdeau,* 371 U. S. 555, 563.

to each other as to justify a finding of an implied repeal by this Court. It is simply not "necessary" that § 94 be repealed in part in order "to make the Securities Exchange Act work." See *Silver* v. *New York Stock Exchange, supra,* at 357.

Moreover, it cannot be said either that "the later act covers the whole subject of the earlier one and is clearly intended as a substitute," or that "the intention of the legislature to repeal [is] clear and manifest." 296 U. S., at 503. The Securities Exchange Act of 1934 covers a "subject" quite different from the National Bank Act. The 1934 Act was enacted primarily to halt securities fraud, not to regulate banks. Indeed, banks were specifically exempted from many provisions of the securities laws,[13] and Congress almost contemporaneously enacted other specific legislation dealing with the problems arising from banks' involvement in the securities business.[14] The passage of that legislation and the exemption of national banks from important provisions of the securities laws suggest, if anything, that Congress was reaffirming its view that national banks should be regulated separately by specific legislation applying only to them.[15] And there is nothing in the legislative history of

---

[13] See 15 U. S. C. §§ 77c (a) (2), 77*l* (2); cf. 15 U. S. C. § 78c (a) (6).

[14] See n. 11, *supra.*

[15] This intention was expressly stated by Congress when it exempted bank securities from the registration-statements requirements of the Securities Act of 1933: "[A]dequate supervision over the issuance of securities of a national bank is exercised by the Comptroller of the Currency." H. R. Rep. No. 85, 73d Cong., 1st Sess., 14 (1933). Subsequent Congresses have continued to follow this policy. For example, while national banks are subject to the registration, reporting, and proxy requirements of the Securities Exchange Act, in 1964 Congress amended the Act so that the administration of those parts of the Act with respect to banks was transferred from the SEC to the various federal banking authorities. See § 3 (e), 78 Stat. 568, 15 U. S. C. § 78*l* (i).

the Securities Exchange Act to support the view that Congress in enacting it gave the slightest consideration to the *pro tanto* repeal of § 94, let alone to indicate "that Congress consciously abandoned its [prior] policy," *Morton* v. *Mancari,* 417 U. S., at 551, or that its intent to repeal § 94 *pro tanto* was "'clear and manifest,'" *United States* v. *Borden Co.,* 308 U. S. 188, 198, quoting *Red Rock* v. *Henry,* 106 U. S. 596, 602.[16]

For these reasons it is impossible to conclude that § 94 was partially repealed by implication in 1934. It follows under the general principles of statutory construction discussed above that the narrowly drawn, specific venue provision of the National Bank Act must prevail over the broader, more generally applicable venue provision of the Securities Exchange Act. We conclude, therefore, that a national banking association is subject to suit under the Securities Exchange Act only in that district wherein it is established, and that the judgment before us must accordingly be affirmed.

*It is so ordered.*

Mr. Justice Stevens, dissenting.

In my judgment a brief reference to the history, purpose, and language of these two special venue statutes will provide a better guide to their meaning than the exposition of the doctrine of implied repeal found in the treatise on statutory construction written by Sedgwick in 1874. Indeed, if Sedgwick were to be our guide, I would heed this advice: "When acts can be harmonized by a fair and liberal construction it must be done."[1]

---

[16] In 1959 Congress reviewed the National Bank Act and adopted an Act designed "to repeal certain [national banking] laws which have become obsolete." See Pub. L. 86–230, 73 Stat. 457. When it did so, it did not repeal § 94.

[1] T. Sedgwick, The Interpretation and Construction of Statutory

It is worth repeating that both of these statutes are special venue statutes. Neither party relies on the general venue provision in 28 U. S. C. § 1391. One relies on a special statute for one kind of litigant—national banks; the other relies on a special statute for one kind of litigation—cases arising under the Securities Exchange Act of 1934. The precise issue before us involves only a tiny fraction of the cases in either special category: Most litigation against national banks does not arise under the Securities Exchange Act; and most litigation arising under the Securities Exchange Act does not involve national banks. Thus, with equal logic we might describe either statute as creating an exception from the somewhat more general provisions of the other.

The rule that the legislature presumably intended to give effect to the more specific statute could therefore be applied to support the petitioner, as well as the respondent bank, in this case.[2] Similarly, without pausing to consider the reason why each statute was enacted, we might simply apply the rule that the more recent of two

and Constitutional Law 98 n. (a) (2d ed. 1874). Coincidentally, this advice is found on the same page from which the Court quotes, *ante,* at 153. We have repeated this principle of statutory construction many times. See, *e. g., United States* v. *Borden Co.,* 308 U. S. 188, 198: "When there are two acts upon the same subject, the rule is to give effect to both if possible."

[2] The rule that the more specific legislation will usually take precedence over the more general rests on the quite reasonable assumption that the legislature's attention was probably focused more directly on the subject matter of the specific than on only one aspect of a much broader subject matter. But since the venue provision of the Civil War banking legislation was a relatively inconsequential part of the entire statute, there is no reason to assume that it was given any more attention than the venue provision in the Securities Exchange Act of 1934.

conflicting statutes shall prevail,[3] rather than the rule that the special statute takes precedence over the general. But such abstract reasoning is less instructive than a consideration of the source and the need for the alleged conflict. Of special importance is an evaluation of the intent of Congress when it enacted these statutes.

The source of the special venue statute for national banks is the Act to Provide a National Currency enacted in 1863[4] and amended in 1864.[5] When these statutes were enacted, Congress apparently assumed that the

[3] Sedgwick quotes this familiar rule with approval: "*Leges posteriores, priores contrarias abrogant.* 'If two inconsistent acts be passed at different times, the last,' said the Master of the Rolls, 'is to be obeyed; and if obedience cannot be observed without derogating from the first, it is the first which must give way. Every act of Parliament must be considered with reference to the state of the law subsisting when it came into operation, and when it is to be applied; it cannot otherwise be rationally construed. Every act is made, either for the purpose of making a change in the law, or for the purpose of better declaring the law; and its operation is not to be impeded by the mere fact that it is inconsistent with some previous enactment.' " Sedgwick, *supra,* at 104. See also *United States* v. *Tynen,* 11 Wall. 88, 92.

[4] 12 Stat. 665, 681.

[5] The federal venue provision was first enacted in 1863, 12 Stat. 681, and in the following year, the provision was amended to authorize suit in state courts. Section 57 of the 1864 Act, which is the predecessor of 12 U. S. C. § 94, reads, in pertinent part as follows:

"SEC. 57. *And be it further enacted,* That suits, actions, and proceedings, against any association under this act, may be had in any circuit, district, or territorial court of the United States held within the district in which such association may be established; or in any state, county, or municipal court in the county or city in which said association is located, having jurisdiction in similar cases: *Provided, however,* That all proceedings to enjoin the comptroller under this act shall be had in a circuit, district, or territorial court of the United States, held in the district in which the association is located." 13 Stat. 116.

newly authorized national banks would not be subject to suit in state courts unless Congress gave its express consent.[6] The fact that the statute was phrased in permissive language suggests that Congress' primary purpose was to give such consent. The mandatory construction given to that language a century later when the Court decided *Mercantile Nat. Bank* v. *Langdeau,* 371 U. S. 555, is consistent with that purpose because it is unlikely that the Civil War Congress intended to authorize the several States to subject national banks to the potential harassment of defending litigation in places other than the county or city where the bank was located.[7] This reason for placing a mandatory limiting construction on the authorization for suit in the state courts is not applicable to the separately enacted federal venue provision; for in any event the federal courts could only entertain such litigation against national banks as Congress might authorize.

In 1934 when Congress enacted the Securities Exchange Act, there was no reason for it to assume that the language in the special jurisdictional and venue provisions of that statute would not apply to national banks. *Langdeau* would not be decided until almost 30 years later, the language in the venue provision of the Civil War banking legislation was permissive, and there was no recognized policy reason supporting an exceptional venue privilege for national banks in federal litigation. There was no longer any doubt about the suability of national banks in either state or federal courts. Moreover, what once might have been regarded as the significant burden of requiring a fledgling bank to haul its records from one county to another within

---

[6] See *Charlotte Nat. Bank* v. *Morgan,* 132 U. S. 141, 144; *First Nat. Bank* v. *Union Trust Co.,* 244 U. S. 416, 428.

[7] *Charlotte Nat. Bank* v. *Morgan, supra,* at 145.

the State, would hardly justify treating banks differently from other litigants in the 20th century.

On the other hand, the special venue section included in the Securities Acts was specifically designed to implement an important legislative objective. Indeed, in construing the comparable provision in the 1933 statute, the Court held that its benefits are so crucial to the legislative purpose that they cannot be waived.[8] In contrast, it is well settled that a national bank's special venue privilege is waivable.[9] Manifestly, there is a

---

[8] "The Act's special right is enforceable in any court of competent jurisdiction—federal or state—and removal from a state court is prohibited. If suit be brought in a federal court, the purchaser has a wide choice of venue, the privilege of nation-wide service of process and the jurisdictional $3,000 requirement of diversity cases is inapplicable." *Wilko* v. *Swan,* 346 U. S. 427, 431. Referring to the analogous provision in the Federal Employers' Liability Act, the Court added: "We said the right to select the 'forum' even after the creation of a liability is a 'substantial right' and that the agreement, restricting that choice, would thwart the express purpose of the statute. We need not and do not go so far in this present case. By the terms of the agreement to arbitrate, petitioner is restricted in his choice of forum prior to the existence of a controversy. While the Securities Act does not require petitioner to sue, a waiver in advance of a controversy stands upon a different footing. . . . On the other hand, it has enacted the Securities Act to protect the rights of investors and has forbidden a waiver of any of those rights." *Id.,* at 438.

[9] "No reason can be suggested why one court of a State, rather than another, both being of the same dignity, should take cognizance of a suit against a national bank, except the convenience of the bank. And this consideration supports the view that the exemption of a national bank from suit in any state court except one of the county or city in which it is located is a personal privilege, which it could claim or not, as it deemed necessary." *Charlotte Nat. Bank* v. *Morgan, supra,* at 145.

See also *Michigan Nat. Bank* v. *Robertson,* 372 U. S. 591, 594; *National Bank* v. *Associates of Obstetrics,* 425 U. S. 460.

difference between the importance of the policies under-lying the two statutes.

But there is no necessary conflict. Since the two Acts can be harmonized by a fair and liberal construction, if we heed Sedgwick's counsel, that "must be done." As already noted, the actual wording of the earlier statute, which used the words "may be had" provides no conflict with a literal reading of the later Act. The conflict is created solely by this Court's interpretation of those words as, in effect, meaning that the trial of a case against a national bank "must be had" in the place specified by Congress rather than the place specified by a state legislature. If we so read the statute, we need only conclude that any later enacted special venue stat-ute which, by its own terms, applies to national banks should be read to mean what it says. Preoccupation with the ancient doctrine of implied repeal should not foreclose this simple construction of the plain language of the 1934 Act.[10]

---

[10] Although the Second Circuit decision in *Bruns, Nordeman & Co.* v. *American Nat. Bank,* 394 F. 2d 300, 303 (1968), supports the result reached by the Court in this case, Judge Friendly ex-pressed the opinion that if the court were writing on a clean slate, it would have reached a contrary conclusion; it reached the result it did only because it felt bound by a prior decision of the Second Circuit which it characterized as giving "a construction to the clause of § 94 dealing with the venue of suits in a federal court quite as Draconian as the Supreme Court has done with respect to the state court clause." The earlier Second Circuit precedent made no analysis of the question whether the clause should be given a mandatory or permissive construction. See *Leonardi* v. *Chase Nat. Bank,* 81 F. 2d 19 (1936). It is also noteworthy that when the Third Circuit considered the question, it concluded that the venue provision of the Securities Exchange Act should be accepted at face value. See *Ronson Corp.* v. *Liquifin Aktiengesell-schaft,* 483 F. 2d 852 (1973); contra: *United States Nat. Bank* v. *Hill,* 434 F. 2d 1019 (CA9 1970). The American Law Institute,

164

The rule that repeals by implication are not favored, like all other canons of statutory construction, is merely one of the guidelines to observe in the search for a construction which will best reflect the real intent of the legislature. When we are dealing with a well-established and clearly defined old rule, it is usually reasonable to suppose that the legislative intent to change such a rule would be unambiguously expressed. Or if we are dealing with an old rule that is an established and important part of our national policy, we must be sure that it is not changed simply by inadvertent use of broad statutory language. Thus, if Congress intended to modify the long-settled practice of preferential hiring of Indians on Indian reservations,[11] or to limit the coverage of a statute as important as the Sherman Act,[12] a court would require an unambiguous expression of intent to make such a change; without such an expression it is reasonable to believe that inadvertence, rather than an intent to repeal, is the actual explanation for the broad language that arguably changes the old rule.[13] But if neither the

Study of the Division of Jurisdiction between State and Federal Courts 413 (1969), pointed out that there "is no obvious reason why a national bank requires a unique and restrictive venue rule, and cannot be treated as is any other corporation for purposes of venue."

[11] The policy of according hiring preference to Indians in the Bureau of Indian Affairs which was involved in *Morton* v. *Mancari*, 417 U. S. 535, 550–551, was not only perfectly clear but had been consistently recognized since at least as far back as 1934.

[12] See, *e. g.*, *United States* v. *Borden Co.*, 308 U. S. 188, 198; *United States* v. *Philadelphia Nat. Bank*, 374 U. S. 321, 350–351; *Silver* v. *New York Stock Exchange*, 373 U. S. 341, 359; *United States* v. *National Assn. of Securities Dealers*, 422 U. S. 694, 719–720.

[13] When Congress intends to change a well-recognized and well-established rule of law, it customarily provides us with evidence of that specific intent. But it is unrealistic to expect the Legislature to consider and expressly mention the impact of a new statute on every old rule that it may modify, particularly if the old rule is not

existence of, nor the reason for, the old rule is clear at the time of the later enactment, there is no special reason for questioning the legislative intent to have the later statute mean exactly what it says. Specifically, in this case, since it is clear that Congress intended national banks to be covered by some sections of the Securities Exchange Act, but not others,[14] and since the purpose of authorizing a broader venue in this type of litigation applies with equal force to national banks and other defendants, the canon of construction strikes me as an unreliable guide for ascertaining the true intent of Congress.

Congress may well have simply overlooked the special venue provision in the Civil War statute, particularly since *Langdeau* had not yet been decided. It may therefore be accurate to describe the omission of any reference to the earlier statute in the legislative history of the later one as inadvertent. But that merely raises the question of whether it is more realistic to imply an exception to the applicable language of the 1934 Act or to conclude that if Congress had thought about this preference for national banks it nevertheless would have enacted the statute it did enact in 1934. There is no doubt in my mind that the 1934 Congress would have done exactly what it did do even if it had foreseen not

only unimportant but not even clearly stated at the time the new statute is enacted. In such a setting the new statute should be interpreted in the light of its own history with the expectation that a certain amount of ancient underbrush will inevitably be cut away. Only to the extent that the old roots retain sufficient vitality to support some desirable and discernible purpose at the time of the later enactment is there any real justification for avoiding an implied repeal.

[14] The Securities Act of 1933 contains explicit exemptions for national banks at 15 U. S. C. §§ 77c (a)(2), 77l (2), as does the Securities Exchange Act at 15 U. S. C. § 78l (i).

only this Court's decision in *Langdeau* but also the Court's willingness to construe the federal venue provision in the same "Draconian" fashion as the state provision, to use Judge Friendly's typically appropriate adjective. I could understand a legislative decision to exempt banks entirely from the coverage of the new law on the theory that an interest in the solvency of national banks entitles them to special immunity, but it seems wholly unrealistic to assume that Congress would treat banks like all other defendants for liability purposes and yet treat them differently for venue purposes.

It is true that we are dealing with only a tiny fraction of the litigation arising under the 1934 Act or of the litigation involving national banks. But that fact merely minimizes the likelihood that a busy Congress will correct an inequitable and anachronistic situation. It is also true that holding the trial in one forum rather than another is hardly an insurmountable burden on either the plaintiff or the bank in this day of easy and rapid transportation—unlike the situation in the Civil War period when the statute that the Court considers controlling was enacted—but the burden on the judiciary is increased by requiring multiple trials whenever national banks participate in an allegedly unlawful securities offering.

In sum, whatever canon of statutory construction is applied, I am persuaded that we are most apt to reflect the intent of Congress faithfully if we give effect to the plain meaning of the 1934 Act and thereby place banks on an equal footing with other corporations which must defend litigation of this kind.

I therefore respectfully dissent.