NEW JERSEY AIR NATIONAL GUARD,
177th Fighter Interceptor Group and
Department of Defense, Petitioners,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent,

American Federation of Government
Employees, AFL–CIO, Local
3486, Intervenor.

No. 81–1592.

United States Court of Appeals,
Third Circuit.

Argued Feb. 19, 1982.

Decided April 12, 1982.

Rehearing and Rehearing In Banc Denied
May 11, 1982.

J. Paul McGrath, Asst. Atty. Gen., William Kanter, Marc P. Richman, Sandra Wien Simon (argued), Appellate Staff, Dept. of Justice, Washington, D. C., for petitioners.

Dennis T. Guise, Dept. of Military Affairs, Annville, Pa., for amicus curiae Com. of Pa., Pennsylvania Nat. Guard.

Paschon, Feurey & Kotzas, Toms River, N. J., for amicus curiae Adjutants Gen. Assoc. of the United States; Lt. Col. Robert V. Paschon, Toms River, N. J. (argued), Major Terrence Woods, Capt. Michael Kiefer, Capt. C. Roger Lunden, on brief.

Robert J. Freehling, Sol., Mary Elizabeth Medaglia, Associate Sol., Ellen Stern (argued), Federal Labor Relations Authority, Washington, D. C., for respondent.

Joe Goldberg, Staff Counsel, AFGE, Washington, D. C., for intervenor.

Before ADAMS and SLOVITER, Circuit Judges, and STERN,* District Judge.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

■ On this appeal from an order of the Federal Labor Relations Authority (FLRA) we must decide whether the New Jersey Air National Guard is obliged to bargain over certain conditions of employment with a union representing National Guard technicians. The FLRA held that the Labor-Management Relations Chapter of the Civil Service Reform Act of 1978 (hereinafter referred to as the "Labor-Management Act"), 5 U.S.C. §§ 7101–7135 (Supp. IV 1980), required the Guard to bargain. The Guard insists that it is precluded from bargaining over the conditions in question by the National Guard Technician Act of 1968 (hereinafter the "Technician Act"), 32 U.S.C. § 709 (1976), which commits these matters to the administratively unreviewable discretion of the adjutant general commanding each state's National Guard units. Because we conclude that Congress intend-

* Hon. Herbert J. Stern, United States District Judge for the District of New Jersey, sitting by designation.

ed the Technician Act, rather than the Labor-Management Act, to govern in this situation, we grant the Guard's petition for review, set aside the decision of the FLRA, and deny the FLRA's cross-petition for enforcement.

## I

Although this case arises in a statutory framework that is somewhat complex, the facts that give rise to the dispute are uncontested and fairly straightforward.

In 1979, the Guard was engaged in collective bargaining with Local 3486 of the American Federation of Government Employees, AFL–CIO (AFGE). Local 3486 represents civilian technicians working for the Guard's 177th Fighter Interceptor Group. In the course of the negotiations, the parties reached an impasse with respect to several issues bearing on the employment of those technicians: provisions in the collective bargaining agreement for reductions-in-force, grievances by employees, and adverse disciplinary actions by the Guard.[1] The Guard contended that it was unable to bargain over those provisions because they go to matters that are committed by the Technician Act to the discretion of the adjutant general of the New Jersey National Guard. Local 3486 maintained that these matters nevertheless fell within the scope of subjects that must, under the Labor-Management Act, be negotiated. The Guard held to its position, and Local 3486 brought a grievance before the FLRA—the agency charged with implementing the Labor-Management Act and overseeing disputes between the federal government and its employees.

In its order of February 20, 1981, the FLRA decided in favor of Local 3486. The agency held that Congress, when it enacted the Labor-Management Act ten years after the Technician Act, intended the later statute to override the Technician Act to the extent that the two were in conflict, and meant to provide Guard technicians with collective bargaining rights even with respect to matters that had previously been within the administratively unreviewable discretion of the adjutant general. Accordingly, the FLRA ordered the Guard to engage in collective bargaining over the disputed matters. The Guard petitioned this Court for review pursuant to 5 U.S.C. § 7123(a), and the FLRA filed a cross-petition for enforcement under 5 U.S.C. § 7123(b). Local 3486 was permitted to join as an intervenor in the action.

## II

The National Guard occupies a unique position in the federal structure. It is "an essential reserve component of the Armed Forces of the United States, available with regular forces in time of war," and "also may be federalized in addition to its role under state governments, to assist in controlling civil disorders." *Gilligan v. Morgan*, 413 U.S. 1, 7, 93 S.Ct. 2440, 2444, 37 L.Ed.2d 407 (1973). As the successor to the state militias of the nation's early years, *see Maryland v. United States*, 381 U.S. 41, 85 S.Ct. 1293, 14 L.Ed.2d 205 (1965), the Guard fills a role recognized and provided for in the United States Constitution. Art. I, § 8, cl. 16; amend. II. This role does not fit neatly within the scope of either state or

---

1. The union proposals at issue read, in full:
   *Reduction-In-Force*
   *Section 8.* An employee will be permitted to grieve any violation of this Article under the disputes provision of this contract.
   *Grievance Procedure*
   *Section 4.* An aggrieved employee affected by discrimination, removal, reduction in grade or pay based on an unacceptable performance or any other adverse action may raise the matter under any statutory appellant [sic] procedure or with the concurrence of the union under the negotiated procedure but not both; except for a discrimination complaint which may be a mixed procedure and filed under both processes.
   *Adverse Disciplinary Action*
   *Section 4(b).* The parties agree that the grievance procedure negotiated herein (Article XI) may be used to adjudicate any misunderstanding or disagreement relating to "just cause" and what is considered "fair and equitable."
   *American Federation of Government Employees, AFL–CIO, Local 3486 and New Jersey Air National Guard, 177th Fighter Interceptor Group,* 5 F.L.R.A. No. 26, slip op. at 1–2 (Feb. 20, 1981).

national concerns; historically the Guard has been, and today remains, something of a hybrid. Within each state the National Guard is a state agency, under state authority and control. At the same time, the activity, makeup, and function of the Guard is provided for, to a large extent, by federal law.

Mirroring this special posture of the Guard is the *sui generis* status of its employees. In addition to purely military personnel, the Guard employs civilians to perform a wide range of administrative, clerical, and technical tasks. Often the responsibilities and duties of these employees, who are generally referred to as National Guard technicians, correspond directly to those of other civilian employees, yet they arise in a distinctly military context, implicating significant military concerns. *See, e.g., Ne-Smith v. Fulton,* 615 F.2d 196, 201 (5th Cir. 1980).

To accommodate the civilian interests of these employees without intruding on the Guard's military and security needs, and to recognize by statute the special employee status that had evolved informally, Congress in 1968 enacted the National Guard Technician Act, 32 U.S.C. § 709. In that Act, all Guard technicians, who had previously been employees of the states, were declared to be federal employees, and were thereby afforded the benefits and rights generally provided for federal employees in the civil service. 32 U.S.C. § 709(d).[2] The Act imposed special reservations to that federal civilian employee status, however. Specifically, Guard technicians were required to serve simultaneously as members of the National Guard, *id.* at § 709(b), and technicians who perform operational duties at air defense sites were subjected to some requirements of irregular additional duty beyond the ordinary workday schedule, *id.* at § 709(g). In addition, the Act set out a number of conditions of employment, relat-

ing to the discipline and discharge of Guard technicians, that were to remain within the final discretion of the adjutants general of the various state National Guards. In particular, the Act provided:

Notwithstanding any other provision of law and under regulations prescribed by the Secretary concerned—

(1) a technician who is employed in a position in which National Guard membership is required as a condition of employment and who is separated from the National Guard or ceases to hold the military grade specified for his position by the Secretary concerned shall be promptly separated from his technician employment by the adjutant general of the jurisdiction concerned;

(2) a technician who is employed in a position in which National Guard membership is required as a condition of employment and who fails to meet the military security standards established by the Secretary concerned for a member of a reserve component of the armed force under his jurisdiction may be separated from his employment as a technician and concurrently discharged from the National Guard by the adjutant general of the jurisdiction concerned;

(3) a technician may, at any time, be separated from his technician employment for cause by the adjutant general of the jurisdiction concerned;

(4) a reduction in force, removal, or an adverse action involving discharge from technician employment, suspension, furlough without pay, or reduction in rank or compensation shall be accomplished by the adjutant general of the jurisdiction concerned;

(5) a *right of appeal* which may exist with respect to clause (1), (2), (3), or (4) *shall not extend beyond the adjutant general of the jurisdiction concerned*; and

---

**2.** This federal employee status was intended primarily to ensure that National Guard technicians would have a retirement and benefit program that was "both uniform and adequate," and to bring technicians within the coverage of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–2680 (1976), regarding third party actions against the United States. S.Rep.No.1446, 90th Cong., 2d Sess. 1–3 (1968); *DiLuigi v. Kafkalas,* 584 F.2d 22, 24 (3d Cir. 1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979).

(6) a technician shall be notified in writing of the termination of his employment as a technician and such notification shall be given at least thirty days prior to the termination date of such employment.

[emphasis added]. *Id.* § 709(e).

Under the statutory scheme of section 709(e)—disregarding for the moment any subsequent federal statute that might modify or supersede it in some way—it is clear that the Guard is not obliged to bargain over the matters disputed here. For example, one issue in contention is whether there must be a procedure, consisting of binding arbitration, by which an aggrieved employee can challenge an adverse disciplinary action. Section 709(e)(3) provides that the adjutant general may, "at any time," remove a technician from his technician employment "for cause," and section 709(e)(5) precludes any administrative appeal extending beyond the adjutant general.[3] This plain language unmistakably forecloses any obligation on the part of the Guard to arbitrate dismissals for cause, either before the decision to dismiss is reached, when such a requirement would contravene section 709(e)(3), or as an appeal procedure following a decision to dismiss, when an arbitration requirement would violate 709(e)(5). The statutory provisions of section 709(e) are equally clear with respect to the other disputed subjects of bargaining: reductions in force and disciplinary actions other than discharge are explicitly committed to the discretion of the adjutant general by section 709(e)(4).

### III

The FLRA and Local 3486 argue that whether or not the Technician Act, standing alone, would preclude a requirement that the Guard negotiate over procedures for dismissals for cause, adverse disciplinary actions, and the other matters in dispute, the subsequent Labor-Management Act superseded the Technician Act and imposed such a requirement. The Labor-Management Act was enacted as part of the comprehensive Civil Service Reform Act of 1978, Pub. L.No.95–454, 92 Stat. 1111 (1978). The objectives of the Reform Act, were, in part, to improve labor-management relations in the federal sector, protect legitimate rights of federal employees, and increase the efficiency of the federal government. *See* H.R. Rep.No.95–1403, 95th Cong., 2d Sess. 3 (1978). To some extent the Reform Act codified institutions and practices that previously had been governed by executive order, but modified those existing practices substantially.[4] One such change was the creation of the FLRA, an agency intended to supervise federal labor-management relations and play a role similar to that performed by the National Labor Relations Board in the private sector. *See id.* at 41; *National Federation of Federal Employees, Local 1263 v. Commandant, Defense Language Institute, West Coast Branch*, 493 F.Supp. 675, 680 (N.D.Cal.1980).

As one of the central features of the Reform Act, the Labor-Management Act sets out a collective bargaining system for federal employees. Under this system, the federal government and unions representing federal employees are obliged to bargain in good faith over the conditions of employment in order to reach a collective bargaining agreement. Exempted from the mandatory subjects of bargaining are matters relating to prohibited political activity or the classification of any position, and matters "specifically provided for by Federal statute." 5 U.S.C. § 7103(12), (14). In addition, bargaining is not required where

---

3. Although section 709(e)(5) has been read to preclude *administrative* appeals, it should be noted that this Court has not construed this provision to foreclose *judicial* review of decisions committed to the discretion of the adjutant general. *See Chaudoin v. Atkinson*, 494 F.2d 1323, 1328–29 n.5 (3d Cir. 1974). *See generally Tennessee v. Dunlap*, 426 U.S. 312, 96 S.Ct. 2099, 48 L.Ed.2d 660 (1976).

4. *See* Executive Order 11491, 3 C.F.R. 861 (1966–1970 compilation), *reprinted in* 5 U.S.C. § 7101 (Supp. IV 1980). *See generally* Comment, *Federal Sector Arbitration Under the Civil Service Reform Act of 1978*, 17 San Diego L.Rev. 857 (1980).

it would be inconsistent with government-wide rules or regulations, or with agency regulations deemed by the FLRA to fill a "compelling need." *Id.* § 7117(a). The FLRA is charged with the responsibility for determining whether or not a specific matter falls within the duty to bargain in good faith, *see id.* § 7117(c), and for resolving other issues relating to the duty to bargain, *see id.* § 7105(a)(2)(E).

Beyond this general requirement that the parties negotiate over the conditions of employment, the Labor-Management Act provides that "any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability." *Id.* § 7121(a)(1). These procedures must be fair, simple, and expeditious, and must furnish the employees and the exclusive bargaining representative with an opportunity to present their case during the proceeding. The procedure also must provide for binding arbitration to resolve any grievance not settled to the satisfaction of both parties. *Id.* § 7121(b). Either party may take exception to an arbitration award and obtain review by the FLRA. *Id.* § 7122.

In negotiating the collective bargaining agreement, the parties may agree to exclude matters from the grievance procedure, and the statute itself exempts several types of grievances from coverage by the procedure: violations of statutory provisions regarding political activities, retirement, health insurance, or life insurance matters, suspensions or removals for national security reasons, and the classification of any position that does not result in the reduction in grade or pay of an employee. *Id.* at § 7121(b)–(c). In the case of grievances covered by procedures set out in other statutes, the aggrieved employee may raise his complaint under either the negotiated procedure or the procedure set forth in the other statute. *Id.* at § 7121(d)–(e). Where an employee has selected the negotiated

procedure over the alternative statutory procedure, review by the FLRA under section 7122 is foreclosed. *Id.* § 7121(f).

The Act also contains a "management rights" provision which provides, in part, that the Act does not affect the authority of a management official

> to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees.

5 U.S.C. § 7106(a)(2)(A). This provision is qualified, however: it does not preclude the negotiation of "procedures which management officials of the agency will observe in exercising any authority under this section." *Id.* § 7106(b)(2). *See generally Department of Defense, Army-Air Force Exchange Service v. Federal Labor Relations Authority,* 659 F.2d 1140 (D.C.Cir.1981).

Exempted from the coverage of the Act are the employees of several federal agencies: the General Accounting Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Tennessee Valley Authority, the Federal Labor Relations Authority, and the Federal Service Impasses Panel. *Id.* § 7103(a)(3). The Act makes no reference whatsoever to the National Guard or National Guard technicians, and the technicians therefore fall within the implicit coverage of the Act.[5]

IV

With these two statutes—the Technician Act and the Labor-Management Act—now set out, we proceed to consider the issue before us on appeal: whether the Technician Act continues to prohibit appeals from certain decisions of the state adjutant general despite the provisions of the Labor-Management Act, which would ordinarily require the establishment of procedures for such appeals.[6]

---

**5.** The Act extends to employees of "Executive agenc[ies]." 5 U.S.C. § 7103(a)(2)–(3). The Technician Act establishes Guard technicians as employees of the Department of the Army or the Department of the Air Force—both executive agencies. 32 U.S.C. § 709(d).

**6.** The FLRA asserts that because it was charged by Congress with the responsibility of

As in any case involving a question of statutory interpretation, our burden here is to give full effect to the congressional intent, as reflected in the legislation. To do so properly we must attempt to harmonize the two statutes that are in apparent conflict. "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). *See also United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939).

Section 709(e)(5) of the Technician Act cuts off any appeal from a decision by an adjutant general on one of the enumerated matters. Section 7121 of the Labor-Management Act, in contrast, would, if applicable to Guard technicians, require arbitration of those matters even after the adjutant general, or a subordinate acting with the authority of the adjutant general, has made a final decision with respect to, for example, an adverse disciplinary action. The procedure would thus provide complainants with an opportunity to seek reversal of the adjutant general's decisions. In short, the Labor-Management Act creates an appeal procedure—precisely the procedure forbidden by the Technician Act.

The FLRA nevertheless has concluded that the two statutes can be harmonized if they are seen as creating alternative routes—the chain of command leading to the adjutant general on the one hand and the negotiated grievance procedure on the other—by which a grievant can raise his claims. *See National Association of Government Employees, Local R12–132 and California National Guard*, 5 F.L.R.A. No. 25, slip op. at 6–7 (Feb. 20, 1981). As the FLRA observed, such an accommodation would appear to satisfy the dictates of the Labor-Management Act, which provide that existing statutory grievance procedures should remain as an alternative to the negotiated procedures. *See* 5 U.S.C. § 7121(e)(1). This outcome, however, rests upon a premise with which we cannot agree: that the Technician Act merely creates a *procedure* for handling grievances. Nothing in section 709(e) sets out vehicles or guidelines by which grievances can be resolved, or creates anything that could fairly be termed a "statutory procedure" within the meaning of the Labor-Management Act. Instead, and quite plainly, section 709(e) imposes a *limit* on procedures: it establishes only that a dispute over one of the enumerated matters, whatever procedural route it may take, must terminate, finally, with the decision of the adjutant general. The "accommodation" posited by the FLRA—a negotiated procedure, which may reject the adjutant general's final decision, as an alternative to a statute limiting grievance procedures to that final decision—therefore, is no accommodation at all; rather, it is a negation of the Technician Act.

Before acceding to such a negation, we must determine whether any other accommodation of the two statutory provisions is possible. Specifically, we must decide whether Congress intended to retain the Technician Act as a narrow exception to the Labor-Management Act, preserving the procedural limitations of section 709(e) for Guard technicians. *Cf. Morton v. Mancari*,

construing and implementing the Labor-Management Act, we must defer to its interpretation of that Act " 'unless there are compelling indications that it is wrong.' " *Department of Defense, Army-Air Force Exch. Serv. v. Federal Labor Relations Auth.*, 659 F.2d 1140, 1161–62 (D.C.Cir.1981) (*quoting Miller v. Youakim*, 440 U.S. 125, 145 n.25, 99 S.Ct. 957, 969 n.25, 59 L.Ed.2d 194 (1979)). In this case, however, we are not faced only with a question of construing the Labor-Management Act. Rather, we must resolve an apparent conflict between that Act and the Technician Act. While we place considerable weight on the interpretation of the Labor-Management Act rendered by the FLRA, we are not obliged to defer to the FLRA's reading of the Technician Act, or to its resolution of the conflict between the two statutes. *Cf. Tsosie v. Califano*, 651 F.2d 719, 722 (10th Cir. 1981) (Secretary of Health, Education and Welfare's construction of agency regulations "is not entitled to special deference to the extent that it rests on the interpretation of another agency's statutes and regulations").

417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974) (employment preference for Indians within Bureau of Indian Affairs, specifically provided for in 1934 statute, remains as implicit exception to the more general requirements of the Equal Opportunity Act of 1972, 42 U.S.C. § 2000e *et seq.*); *Wright v. Alabama Army National Guard,* 437 F.Supp. 54 (M.D.Ala.1977) (Technician Act constitutes specific exception to subsequent Fair Labor Standards Act, 29 U.S.C. § 207), *aff'd* 605 F.2d 943 (5th Cir. 1979) (*per curiam*). In essence, our aim is to ascertain whether Congress intended the specific provisions of the 1968 Technician Act or the more general provisions of the 1978 Labor-Management Act to govern the availability of grievance procedures to Guard technicians. In doing so, we are guided by the language of the statutes themselves, the legislative history underlying each Act, and the apparent or inferable purposes that each Act reflects.

Looking first to the statutory language, we immediately confront the preface to section 709(e) of the Technician Act, which explicitly provides that its terms apply "*Notwithstanding any other provision of law ...*" [emphasis added]. A clearer statement is difficult to imagine: section 709(e) must be read to override any conflicting provision of law in existence at the time that the Technician Act was enacted. Application of this statement is less certain, however, with respect to a statute such as the Labor-Management Act, adopted *after* the Technician Act. The drafters of section 709(e) can hardly be said to have had the Labor-Management Act specifically within their contemplation. Even so, the preemptive language is powerful evidence that Congress did not intend any other, more general, legislation, whenever enacted, to qualify the authority of the state adjutants general as set out in the Technician Act. The language does not preclude a subsequent change of heart on the part of Congress, but it does suggest that any qualification of the terms of section 709(e) would be accepted by Congress only after some consideration of the factors requiring or permitting such a change.

Unlike the Technician Act, the Labor-Management Act does not contain any explicit language overriding all statutes with which it may conflict. Quite to the contrary, the Act in several sections explicitly defers to existing laws where they conflict with the Act: the duty to bargain itself applies only "to the extent not inconsistent with any federal law or any government-wide rule or regulation." 5 U.S.C. § 7117(a)(1); *see id.* § 7103(a)(14)(C). This explicit exemption may not extend to the duty, set out in a separate section, to negotiate a grievance procedure,[7] but again it constitutes some indication of the importance attached by Congress to the specific terms of the Labor-Management Act in relation to other, overlapping statutes. In the case of the Labor-Management Act, unlike that of the Technician Act, the statutory language provides some room for the accommodation of competing legislative purposes.

Because the language in the preface to section 709(e) of the Technicians Act is not conclusive, we turn to the legislative history of the two enactments for further guidance. That history, like the statutes themselves, suggests that Congress intended the Technician Act—and not other legislation such as the Labor-Management Act—to govern the employment status of National Guard technicians.

In the history of the Technician Act, and in particular in the history of the specific provision declaring technicians to be federal employees, we find abundant evidence of serious congressional concern with ensuring the final authority of state adjutants general. In 1968, Congress was reacting to a situation in which National Guard technicians were considered state employees and consequently were not assured of uniform

---

7. 5 U.S.C. § 7121(a), which imposes the duty to bargain over grievance procedures, augments the more general duty to bargain set out in § 7117(a)(1), and therefore may be interpreted to apply even in circumstances where § 7117(a)(1) would not otherwise require bargaining.

treatment with respect to fringe benefits or retirement plans. In addition, it was unclear whether acts of those employees could serve as the basis for an action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–2680 (1976). To remedy the situation, Congress declared technicians to be federal employees. In agreeing to that new status, however, the Senate Committee on Armed Services expressed serious concern with protecting the military authority of the states, and in particular the state adjutants general, over elements of technician employment that implicated military, as opposed to purely civilian concerns. To accommodate the need for some control by the state military, federal employee status was carefully hinged upon the reservations set out in section 709(e) of certain powers to the state adjutants general. In its report, the Committee stated:

> This bill implements the purpose [of the legislation] by converting the technicians to Federal employee status with certain controls on administration and supervision which would as a matter of law remain at the State level. In effect, the technicians will become Federal employees receiving the salaries, fringe and retirement benefits, but with certain administrative control regarding employment supervision remaining with the adjutants general of the jurisdiction concerned under regulations prescribed by the Secretary concerned.

S.Rep.No.1446, 90th Cong. 2d Sess. 2 (1968). In virtually the same breath as it approved the status of technicians as federal employees, the Committee stated its intention to preserve state military authority over a limited number of crucial matters. The controls it recommended were clearly central to the legislation, and reflected an understanding on the part of the Committee that such controls were critical to the military purpose of the Guard:

> The technicians, ... numbering about 42,000, constitute only about 8 percent of the total drill paid strength of approximately 500,000 members of the National Guard. In order that there be some degree of supervision and control at the State level of all National Guardsmen, including technicians in their dual status, the Committee feels *it is essential that the controls enumerated be provided as a matter of law*. Otherwise, there would be varying rules and regulations applying to guardsmen who were technicians as compared to the remaining personnel who are also a part of the National Guard program.

*Id.* at 14–15 [emphasis added].

In light of this vigorous congressional statement of concern regarding the retention of certain state controls, it appears most plausible that Congress would have refused to grant federal employee status to the technicians without simultaneously reserving to the states that limited, but nevertheless crucial, control. From this perspective, section 709(e), which ensures the authority of the state adjutants general, can be viewed as a virtual *quid pro quo* for the section 709(d) grant of federal employee status. This symbionic relationship between the two provisions suggests that a court should be extremely reluctant to expand the scope of one of the two provisions so as to cancel out the other.

Yet, in effect, this is precisely what the FLRA would have us do. Because, under section 709(d), Guard technicians are now federal agency employees, they are within the scope of the Labor-Management Act. *See* 5 U.S.C. § 7103(a)(2)–(3). Because they are encompassed by that Act, the FLRA argues, the section 709(e) restrictions in effect no longer apply—at least to the negotiated procedures required under that Act. But the legislative history of the Technician Act makes it quite doubtful that Congress in 1968 had such an eventuality in mind when it made technicians federal employees. Rather, it appears quite clear from the importance Congress attached to the preservation of state control that, at least in 1968, it intended to bring Guard technicians within the coverage of schemes such as the Labor-Management Act only with the provision that the state controls set out in section 709(e) would remain.

Congress, of course, remains free to change its mind. Nothing in the Technician Act precludes a subsequent Congress from determining that the provisions of section 709(e), previously deemed "essential" to the preservation of state supervision and control over the Guard, are no longer necessary or appropriate. If the manifest intent of the Labor-Management Act were to repeal or modify the provisions of section 709(e), we would, perforce, give effect to that decision. Here, however, we are faced with no specific mention of either the Technician Act or technicians in the legislative history of the Labor-Management Act. There is no reference to the unique state-federal status of those employees; no recognition of any military aspects to the employment of National Guard technicians. In short, we can find no evidence whatsoever that Congress in 1978 had within its contemplation the employment status of National Guard technicians.[8]

█ Although the general language of the Labor-Management Act might nevertheless be taken to override, *sub silentio*, the special provisions of the Technician Act, repeals by implication generally are not favored. *Morton v. Mancari*, 417 U.S. 535, 549–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974). As the Supreme Court stated in *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976), "It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute cover-ing a more generalized spectrum." The *Radzanower* Court took note of the long-standing approval for this rule:

> The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at all.

426 U.S. at 153, 96 S.Ct. at 1992, (quoting T. Sedgwick, The Interpretation and Construction of Statutory and Constitutional Law 98 (2d ed. 1874)). *See also Bulova Watch Co. v. United States*, 365 U.S. 753, 758, 81 S.Ct. 864, 867, 6 L.Ed.2d 72 (1961). To be sure, difficult questions of statutory interpretation ought not to be decided by the bland invocation of abstract jurisprudential maxims. *See, e.g., United States v. Universal C. I. T. Credit Corporation*, 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952). But even when they are not determinative, accepted rules of statutory construction can provide helpful guidance in uncovering the most likely intent of Congress.

A preference for the specific over the general statute makes considerable sense in the situation we confront here. Congress in 1968 turned its attention to the very class

---

8. The FLRA asks us to infer congressional consideration of the effect the Labor-Management Act would have on the status of National Guard technicians from the contemporaneous consideration by Congress of a separate bill, having to do with the membership of military personnel in labor organizations. Pub.L.No. 95–610, 92 Stat. 3085 (1978), codified at 10 U.S.C. § 976 (Supp. IV 1980). The legislative history behind that enactment reveals specific congressional attention to the concerns attending the employment of National Guard technicians. *See* H.R.Rep.No.95–894, 95th Cong., 2d Sess. (1978), *reprinted at* [1978] U.S.Code Cong. & Ad.News 7575. We have no doubt that, as the FLRA suggests, Congress was "aware" of the Technician Act in 1978. We are reluctant, however, to assume from legislative attention to Guard technicians in another context that Congress, in enacting the Labor-Management Act, took into account any effect the Act would have upon the Technician Act. Quite to the contrary, the legislative history with respect to the military labor organization bill—legislation that had a more obvious impact on the status of Guard technicians—provides an example of the attention that one would expect to find if Congress had intended to modify the provisions of the Technician Act. The history of the military labor organization bill constitutes additional evidence that Congress, even in 1978, considered the status of National Guard technicians to be of sufficient consequence to merit discussion and careful consideration before being modified.

of federal employees involved in this dispute. It crafted with care precise provisions intended to meet concerns of federalism and military control that are duplicated nowhere else in the federal service. Legislators in 1968 stressed the importance of the provisions in question to the entire scheme of National Guard employment. One can only infer from this narrowly directed activity that Congress, upon consideration of the issue in dispute here—the right of appeal by a Guard technician—decided that very matter, with explicit and specific language, in 1968. Turning to the 1978 legislation, we are met with a statute addressing the employment concerns of all federal employees—none of whom, with the exception of National Guard technicians, performs military roles under the supervision of state officials. It appears inconceivable that Congress in 1978, without a moment's thought as to the question of state control over the National Guard, or as to the needs of military discipline over Guard technicians in their dual status as civilian and military personnel, intended to eliminate, by mere implication, the controls that Congress carefully had imposed over those employees and deemed "essential" ten years earlier.

Because such a conclusion appears unwarranted by anything contained in the statutes themselves or the legislative histories accompanying them, we must reject the position of the FLRA and hold that the provisions of section 709(e) of the Technician Act remain as exceptions to the terms of the Labor-Management Act. Only this reading of the two statutes successfully gives to both statutes the effect evidently intended by Congress. The tightly focused military concerns reflected in the Technician Act remain satisfied; the more diffuse concerns with the employment status and rights of federal employees are satisfied in their entirety with respect to all but a small percentage of those employees, and satisfied in large part even with respect to that remainder, the National Guard technicians. It bears emphasis that, under the Labor-Management Act, the Guard still must engage in collective bargaining with a union representing Guard technicians: the dispute here is not over coverage by the Act, but over the applicability of a few, concededly important, provisions of the Act. Because we cannot apply those general provisions to Guard technicians without in effect repealing section 709(e) of the Technician Act, and because it is abundantly clear that Congress deemed section 709(e) to be of considerable importance to the proper functioning of the National Guard as a military unit under dual state-federal control, we hold that the requirements of section 7121 of the Labor-Management Act do not override the provisions of section 709(e) of the Technician Act. To do otherwise would permit a subtle subversion of a clear congressional intent.

### V

The petition for review will be granted, the decision of the FLRA will be set aside, and the FLRA's petition for cross-enforcement will be denied.