TELECOMMUNICATIONS RESEARCH
AND ACTION CENTER, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Microband Corporation of America,
Youth News, Intervenors.

No. 86-1289.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 16, 1987.

Decided Jan. 5, 1988.

As Amended Jan. 5 and Jan. 19, 1988.

David W. Danner, with whom Andrew
Jay Schwartzman, Washington, D.C., was
on the joint brief, for petitioner TRAC and
intervenor, Youth News.

Sue Ann Preskill, Counsel, FCC, with
whom Diane S. Killory, General Counsel,
FCC, Daniel M. Armstrong, Associate Gen-
eral Counsel, FCC, Robert B. Nicholson
and Robert Wiggers, U.S. Dept. of Justice,
Washington, D.C., were on the brief, for
respondents.

Paul J. Sinderbrand, Washington, D.C.,
entered an appearance, for intervenor Mi-
croband Corp. of America.

Before WALD, Chief Judge, MIKVA,
Circuit Judge, and McGOWAN, Senior
Circuit Judge.*

Opinion for the Court filed by Chief
Judge WALD.

WALD, Chief Judge:

This petition involves Federal Communi-
cations Commission (FCC) rules promul-
gated to allow the so-called "excess capaci-
ty" of microwave frequencies in a portion
of the radio spectrum allocated for Instruc-
tional Television Fixed Services (ITFS) to
be used for the transmission of noneduca-

---

* Judge McGowan had fully concurred in this    opinion before his death.

tional materials. Petitioner, Telecommunications Research and Action Center (TRAC), and intervenor, Youth News,[1] challenge two aspects of the new ITFS regulatory scheme, which the Commission established in *Second Report and Order*, 101 F.C.C.2d 49 (1985), J.A. at 1, and reaffirmed in *Memorandum Opinion and Order*, 51 Fed.Reg. 9796 (1986), J.A. at 89. First, TRAC questions the Commission's failure to regulate the newly permitted ITFS programming aimed at the general public as "broadcasting" under the Communications Act of 1934. 47 U.S.C. § 153(*o*). TRAC also takes exception to new FCC rules that provide for lotteries in ITFS licensing proceedings because they do not comply with 47 U.S.C. § 309(i), governing lotteries for broadcast licenses, which requires the FCC to grant preferences to applicants who will diversify ownership of mass communications media.

Because the Commission has failed to give adequate reasons either for classifying the nonsubscription use of excess ITFS capacity as nonbroadcasting or for deferring examination of the issue, we remand the classification issue to the agency for further consideration. We also find that the Commission does not have the inherent authority to conduct lotteries under its current selection procedure for ITFS licensees without employing media diversity and minority ownership preferences as mandated by § 309(i). We therefore vacate those portions of the rules dealing with nonsubscription leasing and lotteries and remand to the Commission for reconsideration.

### I.

The FCC established ITFS in 1963 to enable educational institutions to provide instructional and cultural material to enrolled students at selected receiving locations. *See Educational Television*, 39 F.C.C. 846, 852–54 (1963). Transmissions were normally made on a point-to-point basis to classrooms or other learning centers specially equipped for receiving and converting the signal. For two decades, in order to promote the educational purpose of the service, the Commission strictly limited both the permissible uses of ITFS and eligibility for ITFS licenses.

In 1983, however, the Commission instituted a series of policy changes intended to remedy the perceived inefficient use of that portion of the spectrum dedicated solely to ITFS. Faced with an increasing demand for radio frequencies, the Commission commenced a rulemaking that contemplated commercial use of underutilized ITFS channels. *Notice of Proposed Rulemaking*, 48 Fed.Reg. 29,553 (1983), J.A. at 94. The FCC decided to reallocate eight former ITFS channels per market for use by operators of Multipoint Distribution Service (MDS). *Report and Order*, 94 F.C.C.2d 1203 (1983), J.A. at 102.[2] The Commission also decided to allow licensees on the remaining ITFS frequencies to transmit noneducational programming in addition to their regular instructional programming. *Id.* The Commission authorized ITFS licensees and their lessees to disseminate commercial programming to the general public, requiring only that several hours per weekday be used for traditional ITFS programming.

In conjunction with these decisions, the Commission issued its *Notice of Proposed Rule Making*, 48 Fed.Reg. 29,553 (1983), J.A. at 94, to reevaluate rules governing the licensing and operation of ITFS stations. On August 10, 1984, the FCC issued a *Further Notice of Proposed Rulemaking*, 98 F.C.C.2d 1249 (1984), J.A. at 188, soliciting comments on other issues including procedures for selecting among competing applicants.

This *Further Notice* made no mention of the Commission's regulatory classification of the newly authorized ITFS uses. In a

---

1. Microband Corporation of America, an intervenor and participant in the proceedings below, also filed as an intervenor in this appeal but has not filed any papers with the court indicating its position. Media Access Project was also a petitioner before the agency but dismissed its peti-

tion for review in this court simultaneously with the filing of TRAC's brief.

2. MDS is a service, technologically similar to ITFS, that is used primarily for the distribution of television entertainment programming.

separate statement, however, Commissioner Rivera solicited commentary on this issue and criticized his "colleagues' unfortunate head-in-the-sand approach. (*i.e.*, refusing to admit the existence of a problem by failing even to solicit comment on this question.)" *Id.* at 1272, J.A. at 211. Commissioner Rivera was concerned that this court, in *National Ass'n of Broadcasters v. FCC*, 740 F.2d 1190 (D.C. Cir.1984), had recently held that a similar new service must be regulated as "broadcasting" under the Communications Act of 1934. 47 U.S.C. § 153(*o*). He noted that "by default" ITFS continued to be considered a private nonbroadcast service despite the FCC's authorization of uses substantially different from its original educational function.

The Commission, noting that the number of ITFS applicants had grown significantly since its announcement that "excess capacity" could be used for commercial transmissions, *Second Report and Order*, 101 F.C.C.2d at 52, J.A. at 3, proposed four alternative procedures for selecting between mutually exclusive applicants. *Further Notice* 98 F.C.C.2d at 1263, J.A. at 202. The alternative methods included: (1) a lottery with preferences; (2) a "paper hearing" approximating comparative hearings; (3) a mechanical point system; and (4) a combination of a point system with a random drawing among identical or very close applicants. *Id.* The Commission also specifically requested comment on "the appropriateness of following the lottery stat-ute, Section 309(i) of the Act, for the ITFS service." *Id.*

On October 17, 1984, petitioner and Media Access Project (MAP), a party in the agency proceedings, filed comments in response to the Commission. J.A. at 213. These comments questioned the impact of the FCC's excess capacity decision upon the classification of ITFS as nonbroadcasting; they argued that omnidirectional transmission of general interest programming over ITFS frequencies should be regulated as broadcasting.[3] J.A. at 217. Again, in reply comments filed on November 16, 1984, MAP and TRAC urged the Commission to classify ITFS as broadcasting for regulatory purposes. J.A. at 236, 256–57. After consideration of TRAC's and other comments on the broadcast classification issue, J.A. at 257, the Commission released its *Second Report and Order*, 101 F.C.C.2d 49 (1985), J.A. at 1, containing final regulations for ITFS, but again failing to discuss the broadcast classification issue.

A major portion of the *Second Report and Order* established procedures to be used in selecting among the increasing number of competing ITFS license applicants. The Commission promulgated rules employing a point system examining five factors with a total of fourteen possible points and a random lottery to resolve ties among those applicants with the same point score.[4] The Commission claimed that

---

**3.** The Act defines "broadcasting" as "the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations." 47 U.S.C. § 153(*o*). When radio dissemination fits this definition it becomes subject to the Commission's regulatory authority under Title III of the Act. *See, e.g.,* 47 U.S.C. 312(a)(7) (requiring licensees to make reasonable time available for legally qualified candidates for federal elective office); 47 U.S.C. § 315 (equal time requirement); 47 U.S.C. § 317 (sponsorship identification).

**4.** The system provides in pertinent part that:
(a) If timely filed ITFS applications are determined to be mutually exclusive, such applications will be processed and assessed points to determine the tentative selectee for the particular channels. The tentative selectee will be the applicant with the highest point total under the procedure set forth in this section,

unless the provisions of paragraph (c) of this section apply....
(b) Each application will be awarded a predetermined number of points under the criteria listed:
(1) Four points for applicants that are "local" ...
(2) Three points for accredited schools ...
(3)(i) Two points for applicants whose request, if granted, would result in the acquisition of four or fewer ITFS channels by that applicant within the particular area;
(ii) Two points for new applicants ...
(4) One point for a proposed weekly schedule of twenty-one or more average hours per channel per week of formal educational programming or of forty-one or more average hours per channel per week of other ITFS programming; two points for forty-one or more average hours per channel per week of formal education programming, or for sixty-

it possessed inherent authority, derived from several broad provisions of the Communications Act of 1934, to employ a lottery in this selection system. *See* 47 U.S.C. §§ 154(i), 154(j), 303(g).

In its order, the Commission expressly concluded that the lottery statute passed by Congress in 1982,[5] did not provide authorization for any system of random selection for ITFS licensing. 101 F.C.C.2d at 67, J.A. at 18. Rather, the Commission concluded that § 309(i) authorized lotteries only when certain criteria elaborated in the statute's conference report were met.[6] Be-

> one or more hours per channel per week of ITFS programming where at least twenty-one of those hours are formal educational programming;
>
> (5) One point for an existing E or F channel licensee seeking to relocate and showing an established need for an expanded service....
>
> (c) If the best qualified (highest scoring) two or more applicants have the same point accumulation, they will be given thirty days from the date of release of such decision to notify the Commission of any agreement to divide the use of the channels. If no agreement is reached and advanced to the Commission within that time, the tentative selectee will then be determined through a tie-breaker mechanism.
>
> (d) The tie-breaker will use a mechanical random-selection process, under the direction of the Secretary's office, in which each qualifying applicant has an equal chance.
>
> 47 C.F.R. 74.913 (1986) (citations omitted).

**5.** The lottery statute enacted in 1982 reads:

> (1) If there is more than one application for any initial license or construction permit which will involve any use of the electromagnetic spectrum, then the Commission, after determining that each such application is acceptable for filing, shall have authority to grant such license or permit to a qualified applicant through the use of a system of random selection.
>
> (2) No license or construction permit shall be granted to an applicant selected pursuant to paragraph (1) unless the Commission determines the qualifications of such applicant pursuant to subsection (a) of this section and section 308(b) [47 USCS § 308(b).]. When substantial and material questions of fact exist concerning such qualifications, the Commission shall conduct a hearing in order to make such determinations. For the purpose of making such determinations, the Commission may, by rule, and notwithstanding any other provision of law—
>
> (A) adopt procedures for the submission of all or part of the evidence in written form;
>
> (B) delegate the function of presiding at the taking of written evidence to Commission employees other than administrative law judges; and
>
> (C) omit the determination required by subsection (a) with respect to any application other than the one selected pursuant to paragraph (1).
>
> (3)(A) The Commission shall establish rules and procedures to ensure that, in the adminis-

> tration of any system of random selection under this subsection used for granting licenses or construction permits for any media of mass communications, significant preferences will be granted to applicants or groups of applicants, the grant to which of the license or permit would increase the diversification of ownership of the media of mass communications. To further diversify the ownership of the media of mass communications, an additional significant preference shall be granted to any applicant controlled by a member or members of a minority group.
>
> (B) The Commission shall have authority to require each qualified applicant seeking a significant preference under subparagraph (A) to submit to the Commission such information as may be necessary to enable the Commission to make a determination regarding whether such applicant shall be granted such preference. Such information shall be submitted in such form, at such times, and in accordance with such procedures, as the Commission may require.
>
> (C) For purposes of this paragraph:
>
> (i) The term "media of mass communications" includes television, radio, cable television, multipoint distribution service, direct broadcast satellite service, and other services, the licensed facilities of which may be substantially devoted toward providing programming or other information services within the editorial control of the licensee.
>
> (ii) The term "minority group" includes Blacks, Hispanics, American Indians, Alaska, Natives, Asians, and Pacific Islanders.
>
> (4)(A) The Commission, not later than 180 days after September 13, 1982, shall, after notice and opportunity for hearing, prescribe rules establishing a system of random selection for use by the Commission under this subsection in any instance in which the Commission, in its discretion determines that such use is appropriate for the granting of any license or permit in accordance with paragraph (1).
>
> (B) The Commission shall have authority to amend such rules from time to time to the extent necessary to carry out the provisions of this subsection. Any such amendment shall be made after notice and opportunity for hearing.
>
> 47 U.S.C. § 309(i).

**6.** According to the Commission:

> The lottery has been specifically authorized by Congress for those situations in which sig-

cause ITFS did not meet these criteria the Commission considered such a procedure "neither required nor appropriate." *Id.* Specifically, the FCC reasoned that the number and backlog of mutually exclusive ITFS applications are neither so great nor expected to become so great, as to make the lottery the most practical and efficient method of selecting among applicants. *Id.* at 68, J.A. at 19. The Commission claimed that since its proposed tie-breaker lottery did not meet these prerequisites to application of § 309(i), its lottery scheme need not conform to the requirements of § 309(i) either. In particular, no preference need be given to "further diversify ... ownership" or to increase participation by "members of ... minority group[s]," as required by § 309(i)(3).

TRAC and MAP challenged both the Commission's adoption of a lottery system that was not in conformity with § 309(i) and its failure to address the issue of proper broadcast classification. *Petition for Reconsideration* (July 29, 1985), J.A. at 276. Rejecting both claims, the Commis-

sion denied their petition for reconsideration. *Memorandum Opinion and Order*, 51 Fed.Reg. 9796 (1986), J.A. at 89. *See also ITFS Reconsideration Order*, 59 Rad. Reg.2d (P & F) 1355 (1986), J.A. at 55. In its denial of reconsideration, the Commission relied on its recent determination[7] that § 309(i) was not intended to cover a "tie-breaker" situation. 51 Fed.Reg. at 9797, J.A. at 90; 59 Rad.Reg.2d (P & F) at 1373, J.A. at 73 (citing *First Reconsideration/Random Selection*, 49 Fed.Reg. 49,-466, 49,467 (1984), *petitions for review denied sub nom. National Latino Media Coalition v. FCC*, 816 F.2d 785 (D.C.Cir. 1987)).[8] The Commission also finally addressed the issue of classifying excess capacity transmissions as broadcasting; since ITFS excess capacity is "generally" or "typically" provided on a subscription basis and the Commission, in another proceeding, *Subscription Video Notice of Proposed Rulemaking*, 51 Fed.Reg. 1817 (1986), was considering whether all subscription services should be treated as nonbroadcasting, it concluded that allowing noneducational

nificant public benefit would flow from its use. The decisional criteria for employing lotteries include considering whether (1) there is a large number of licenses available in the particular service; (2) there is a large number of mutually exclusive applications for licenses; (3) there is a large backlog; (4) a lottery would significantly speed up the process of getting service to the public; and (5) greater diversity of information in a community would result.
101 F.C.C.2d at 67–68 (citing, H.R.Conf.Rep. No. 765, 97th Cong. 2d Sess. 37 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2237, 2281), J.A. at 18–19.

7. The Commission's views on this matter have changed over time. The FCC initially believed that the 1981 lottery statute gave it the authority to conduct tie-breaker lotteries:
   The effect of this *new* authority would be to enable the ALJ to declare that the licensee could be selected from among the "deadlocked" applicants (*i.e.,* that there is no material public interest basis for selecting one over another) by a lottery.
   Report and Order, 89 F.C.C.2d 257, 279 (1982) (emphasis added). After refusing to implement the 1981 amendment, the Commission petitioned Congress for new and less fettered authority to conduct tie-breaker lotteries:

In those situations where there are no significant differences between competing applicants, we need statutory authority, with sufficient administrative flexibility, to use a lottery to select an initial licensee.
*Id.* at 258 (emphasis added). In response to the 1982 Amendment the Commission explained:
   We have analyzed the arguments that have been raised and concluded that the language of both the statute and the *Conference Report* permits the use of *ad hoc* lotteries in "tied" cases.
Second Report and Order, 93 F.C.C.2d 952, 959 (1983).
   Then, a year later, on December 20, 1984, the FCC about-faced, concluding that the new legislation did not authorize tie-breakers but that its inherent authority under the 1934 Communications Act did. First Reconsideration/Random Selection, 49 Fed.Reg. 49,466, 49,467 (1984), J.A. at 269, 270.

8. In *National Latino Media Coalition v. FCC*, 816 F.2d 785 (D.C.Cir.1987), this court held that the petitioner's challenge to the FCC's position on tie-breaker lotteries was unripe because the Commission had issued no more than a mere statement of policy, or interpretive rule. Now, however, provisions for a tie-breaker lottery have been incorporated into the Commission's rules and the Commission has bound itself to conduct a lottery if confronted with a tie.

uses of ITFS frequencies did not require a reclassification. 51 Fed.Reg. 9796 (1986), J.A. at 89.[9]

This petition for review followed.[10]

## II.

Indisputably, ITFS that is used for its original purpose of providing educational programming is not broadcasting; transmissions with a precise educational purpose intended for use by a narrow group of students are clearly not "dissemination of radio communications intended to be received by the public...." 47 U.S.C. § 153(*o*). Furthermore, whether noneducational ITFS transmissions provided on a subscription basis are properly considered broadcasting is the subject of another appeal pending in this court and an issue that we will pretermit at this time.[11] TRAC and Youth News, however, urge that we do need to decide now whether noneducational ITFS transmissions provided on a nonsubscription basis should be regulated as broadcasting. *See* 47 U.S.C. § 153(*o*). Broadcasting, as defined by § 153(*o*), is subject to regulation under Title III of the Communications Act, and if an ITFS service constitutes broadcasting, the Commis-

sion has the duty to ensure its conformity with statutory requirements.[12]

The Commission initially claimed that alternative uses of ITFS frequencies are not broadcasting because they are "typically" provided on a subscription basis. Now, while conceding that its new regulations allow ITFS to be used for nonsubscription commercial programming, the Commission claims that it has merely deferred the classification issue until it becomes aware of a licensee who is actually providing such nonsubscription service. The Commission, however, has failed to provide a reasoned basis for either position.

The problem with the Commission's first rationale is that it has already made a decision on the broadcast classification of nonsubscription ITFS. By making such services permissible, it has enabled them to operate within the nonbroadcast classification of traditional ITFS but without prior FCC approval. *Second Report and Order*, 101 F.C.C.2d 49 (1985), J.A. at 1. It has done so, moreover, without ever forthrightly addressing the issue of whether they are subject to "broadcast" regulation. When fundamentally changing the permissible use of a medium, however, the Commission has a duty to address significant issues that parties raise in the course of its rule-

---

**9.** The Commission explained that:
    ... the excess capacity use to which the petitioner refers is typically provided on a subscription basis. In a separate proceeding, the Commission has proposed to classify all subscription services as "nonbroadcast," based on their specialized point-to-point or point-or-multipoint nature, and *will not change its initial classification* of ITFS as a nonbroadcast service.
51 Fed.Reg. at 9798, J.A. at 91 (emphasis added).
    The Commission had expressed the same reasoning in an earlier memorandum opinion and order:
    As for classifying one part of an ITFS station's operation differently, the excess capacity use to which MAP refers is typically provided on a subscription basis.
    ... Accordingly, in view of the pending reclassification proceeding and the unsettled state of commission precedents regarding subscription services, *the initial classification of ITFS as a nonbroadcast service will not be changed at this time.*
59 Rad.Reg.2d (P & F) at 1376, J.A. at 76 (emphasis added; citations omitted).

**10.** After this case was filed the Commission issued its report and order in the subscription video proceeding. In the Matter of Subscription Video, Gen. Docket No. 85–305, 2 F.C.C. Rec. 1001 (Feb. 17, 1987), FCC Brief Attachment A. In that order, the Commission announced that all subscription services would be considered nonbroadcasting, *Id.* at 1003, and specifically included ITFS. *Id.* at 1009 n. 27. The Subscription Video proceeding is under review in another case before this court. *National Ass'n for Better Broadcasting v. FCC,* No. 87–1198 (D.C. Cir. May 4, 1987).

**11.** In the Matter of Subscription Video, Gen. Docket No. 85–305, 2 FCC Rec. 1001 (1987), *appeal docketed sub nom.* National Ass'n for Better Broadcasting v. FCC, No. 87–1198 (D.C. Cir. May 4, 1987).

**12.** Such regulation includes requirements of sponsorship identification, 47 U.S.C. § 317, and equal opportunity for political candidates to use broadcast stations. 47 U.S.C. § 315.

making.[13] Here the FCC simply said that because the new service would "typically" be provided on a subscription basis and because an ongoing rulemaking was considering classifying all subscription services as not broadcasting, there was no reason to change the initial classification of ITFS. *See supra* note 9.

Only after this petition for review was filed did the FCC explicitly adopt its deferral explanation; in a terse footnote in its *Subscription Video* decision the Commission stated that:

> Although section 2.106 of our rules indicates that the frequencies could be used for some types of nonsubscription service, we know of no proposals to use excess capacity to provide nonsubscription service on the spectrum. Accordingly, it is not necessary at this time to decide the appropriate classification of any such service that might be offered.

*Subscription Video*, General Docket No. 85–305, 2 F.C.C. Rec. 1001, 1009 n. 27 (1987), *appeal docketed sub nom. National Ass'n for Better Broadcasting v. FCC*, No. 87–1198 (D.C.Cir. May 4, 1987). Even if this *post hoc* explanation in a subsequent case is appropriately considered in the context of this petition for review, the Commission has failed to offer a reasoned basis for its position. *See Action for Children's Television v. FCC*, 821 F.2d 741, 745 (D.C. Cir.1987).

The Commission's disavowal in a subsequent case that it had rendered a final decision about the status of nonsubscription ITFS excess capacity leasing does not disturb its earlier decision in this proceeding that all ITFS would remain classified as nonbroadcasting for the indefinite present. That decision not to reclassify presently affects the rights and obligations of ITFS licensees, despite the FCC's claim that the issue of service classification for nonsubscription, alternative ITFS is still an open one. The status quo remains: the FCC *will not* apply Title III regulation to any ITFS nonsubscription licensees.

Neither the Commission's decision nor the record contains any evidence bearing on the likelihood of ITFS use for the transmission of general interest programming on a nonsubscription basis.[14] The naked assertion that most excess capacity ITFS services are offered on a subscription basis carries little weight because the Commission does not require licensees to disclose the basis upon which their lessees will offer programming.[15] Quite plausibly an ITFS supplier might offer two advertiser supported channels as an inducement to viewers to install receiver/converters—hoping that they would then buy subscription services on the remaining channels. The Commission admits that nothing in its regulations prohibits such uses of excess ITFS capacity and that the technical capability for such uses exists.[16] Yet, the FCC totally fails to address what practical or economic factors combine to make ITFS offerings feasible only on a subscription basis.

---

**13.** Commissioner Rivera said in his separate statement that:

> In light of the recent decision in National Association of Broadcasters v. FCC, one of the questions that also must be resolved is how best to put this service into compliance with the regulatory classification guidelines outlined by the Court.[2] ... My colleagues' unfortunate head-in-the-sand approach (i.e., refusing to admit the existence of a problem by failing even to solicit comment on this question), not only *puts the status of ITFS operations at legal risk,* but deprives this agency of useful public input....
>
> 2. By *default, ITFS is presently considered a private, nonbroadcast service....* Now that we permit ITFS licensees to lease excess capacity to MMDS programmers, that classification plainly must be revised.

98 F.C.C.2d at 1272–73 (1984) (footnote in original; footnotes omitted; emphasis added), J.A. 211–12.

**14.** The Commission points out in its brief that most ITFS applications have come from MDS operators and MDS operators normally offer their programming on a subscription basis. This is, of course, *post hoc* information, not contained in the Commission's decision or in the record.

**15.** The Commission's assumption derives some additional support, however, from TRAC's own failure to uncover any instances of nonsubscription services on ITFS channels.

**16.** *See* Subscription Video, 2 FCC Rec. at 1009 n. 27 ("section 2,106 of our rules indicates that the frequencies could be used for some types of nonsubscription service").

The Commission, moreover, failed to suggest why broadcast regulation should not apply to nonsubscription commercial ITFS programming. It argues only that regulating nonsubscription, noneducational ITFS now would be premature because of the "difficulty of deciding the issue without a concrete proposal to examine." Respondent's Brief at 20. But the Commission offers no explanation why the status of nonsubscription ITFS as broadcasting should be any more fact-specific than subscription ITFS. The Commission has completed a rulemaking that classifies *all* subscription services, including ITFS, as nonbroadcast. Yet, it provides no reasons why nonsubscription ITFS services would be so much more difficult to classify.

The Commission argues finally that it need not address this issue until it is shown that some ITFS licensee is providing nonsubscription service. It claims that if any providers of nonsubscription ITFS transmissions emerge, the Commission will find out about them and then determine their proper classification. We do not doubt the Commission's authority to modify a licensee's classification in the context of a specific adjudication, *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), although we do note that even if the FCC were to find out about violations of Title III on nonsubscription ITFS, it could not order retroactive relief, because ITFS is and always has been classified as nonbroadcasting. Thus, it appears highly unlikely that any victims of an interim erroneous classification of nonsubscription ITFS as nonbroadcasting would have any practical remedy.

▮ Our basic problem, however, is with the FCC's assumption that it will inevitably find out about the existence of any nonsubscription ITFS use because any one allegedly injured by an ITFS service's failure to comply with broadcast regulation will inform the Commission. The very fact that the Commission itself has failed to reclassify the service as broadcasting may well deter private citizens from objecting since there is no apparent law violation about

which to complain. The Commission nonetheless anticipates that viewers and their representatives, slighted political candidates, and ITFS competitors will likely challenge the nonbroadcast status of any nonsubscription ITFS services. But even assuming these groups will become aware of any such cases, the fact remains that it is not their responsibility but the FCC's to regulate broadcast services and to decide how those services should be classified. What the Commission is doing by its inaction is silently authorizing possible statutory violations but refusing to decide the issue until a private challenge arises. It is an administratively awkward posture, at best.

We therefore remand for the FCC to make the basic classification determination or to explain why it should not have to at this time. Its duty is to "execute and enforce" the Communications Act. *See* 47 U.S.C. § 151. If it continues to defer, it should explain what useful information it expects to learn in any interim period and, at a minimum, consider requiring licensees to inform the agency of any plans to provide noneducational ITFS on a nonsubscription basis.

### III.

The second issue in this case implicates the Commission's authority to establish a selection procedure employing a random lottery at the end of a limited comparative proceeding when there is a tie between competing applicants for an ITFS license. The Commission has adopted such a modified comparative hearing system including a tie-breaker device in a formal rule, 47 C.F.R. § 74.913(c) (1986) ("the tentative selectee will then be determined through a tie-breaker mechanism"), and has announced its intention to employ the lottery procedures in a particular case.[17] TRAC claims that there is no statutory authority for the Commission's establishment of this lottery system for ITFS licenses.

In the *Second Report and Order*, 101 F.C.C.2d 49, J.A. at 1, the FCC set out its

---

**17.** *See e.g., Instructional Telecommunications*

*Foundation, Inc.,* F.C.C. 87–275 (Aug. 25, 1987).

new procedure for selecting among mutually exclusive ITFS license applicants. *See supra* note 4. The Commission chose neither a traditional comparative hearing nor the random selection procedures with minority and diversity preferences authorized by § 309(i); instead, the FCC established a hybrid procedure for ITFS licenses with a limited number of points assigned for relevant criteria and a random lottery to resolve deadlocks. In the *Second Report and Order*, the Commission also abandoned its earlier position that its authority to conduct tie-breaker lotteries was derived from § 309(i) and claimed instead "inherent authority" to conduct tie-breaker lotteries under §§ 303(g), 154(j) and 154(i) of the 1934 Communications Act.[18] The Commis-

sion claims that the lottery used in its selection procedure is merely an *ad hoc* tie-breaker and, as such, a reasonable exercise of its authority to regulate in the "public interest."

■ Since we find that the ITFS selection procedure constitutes a "system of random selection" within the meaning of the 1982 amendment, we reverse and remand. While in the absence of specific indicia of Congressional intent, we normally defer to an agency's reasonable interpretation of its organic statute, *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), in this case, the Commission's interpretation of the 1934 Act[19] is precluded by the lan-

**18.** The Commission sought to ground its new authority in several general provisions of the 1934 statute. The Commission first cited its general mandate to "encourage the larger and more effective use of radio in the public interest" as authority for *"ad hoc"* lotteries. 47 U.S.C. 303(g). The FCC also relied on its authority to "conduct its proceedings in such a manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j). A year later, in its second reconsideration the Commission also pointed to § 154(i)'s authorization to "perform any and all acts, make such rules and regulations and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions." *See* Memorandum and Opinion Order, 50 Fed.Reg. 50,167 (1985).

**19.** Even without the 1982 amendments, the Commission's claim to inherent authority is dubious. As we have often said, "the weight we accord an agency interpretation is determined in part by the interpretation's *consistency* with prior agency pronouncements, as well as *the length of time* the agency has applied its interpretation and whether the agency made its interpretation *contemporaneously* with the enactment of the statute." *Baltimore & Annapolis R.R. Co. v. WMAT*, 642 F.2d 1365, 1371 (D.C.Cir. 1980) (citations omitted; emphasis added). *See also NLRB v. Food and Commercial Workers, Local 23*, — U.S. —, — n. 20, 108 S.Ct. 413, 421 n. 20, 98 L.Ed.2d 429 (U.S.1987). The Commission's current views concerning its inherent authority are not only of very recent vintage, but come 50 years after enactment of the provisions relied upon, and are inconsistent with its prior interpretation of those provisions. *See supra* note 7. *But see Alexander S. Klein*, 86 F.C.C.2d 423, 432 n. 44 (1981) (briefs requested on whether the Commission had authority to conduct a tie-breaker lottery but issue not

reached because no deadlock). On December 20, 1984, in its *First Reconsideration*, 49 Fed. Reg. at 49,467, J.A. at 270, the FCC claimed, for the first time, inherent authority under the public interest provisions of the 1934 Act for tie breakers.

When an agency changes its position, it must supply persuasive reasons for that change. As we have recently explained:

It has never been supposed ... that an agency cannot change its course even when there is ample reason for doing so; instead, we have held simply that an agency must supply a *persuasively reasoned explanation* for modifying its earlier position that is itself rationally grounded in the evidence before the agency. *Reservation Tel. Coop. v. FCC*, 826 F.2d 1129, 1135 n. 4 (D.C.Cir.1987) (emphasis added; citations omitted). Thus, the Commission must offer not only a reasonable interpretation of the 1934 statute, but a persuasive explanation of its departure from the view that it needed independent authorization to conduct lotteries, including tie breakers.

The Commission's current justification for its inherent authority argument under the 1934 Act is that in the case of a tie at the end of a comparative hearing, anything other than random selection would force the Commission "to make a strained or arbitrary decision" violative of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *First Reconsideration*, 49 Fed.Reg. at 49,467, J.A. at 270. This argument, of course, ignores the fact that the FCC has been making such "strained" and "arbitrary" decision, choosing the single best applicant in comparative hearings under its public interest authority, for decades. *See Ashbacker Radio Corp. v. FCC*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). The Commission gave no indication why it expects true ties to arise more frequently today than prior to 1984. Furthermore, the Commission has offered no additional explanation of why it

guage and legislative history of the 1982 amendment, which the Commission itself initially viewed as governing tie-breaker lotteries. *See NLRB v. Food and Commercial Workers, Local 23,* —— U.S. ——, ——, —— n. 20, 108 S.Ct. 413, 420, 421 n. 20, 98 L.Ed.2d 429, 4041 n. 20 (U.S.1987); *INS v. Cardoza–Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 1221 & n. 30, 94 L.Ed.2d 434 (1987) (the court may employ traditional tools of statutory construction to ascertain clear congressional intent and where an agency's interpretation is inconsistent, "it is entitled to less deference").

## A.

Our first stop is at the language of the lottery statute itself. The plain language of § 309(i) supports the view that a selection system that relies on a tie-breaker lottery but is conducted without media diversity and minority preferences is impermissible. It authorizes the Commission to grant licenses to qualified applicants "through the use of a system of random selection." 47 U.S.C. § 309(i)(1). Furthermore, it indicates that Congress envisioned more than one possible system, because it requires the Commission to establish rules and procedures for *"any* system of random selection under this subsection." *Id.* at § 309(i)(3)(A) (emphasis added). Finally, in the administration of "any system of ran-

dom selection" it requires "significant preferences ... to applicants ... the grant to which of the license or permit would increase the diversification of ownership of the media of mass communication."[20]

The ITFS licensee selection procedure constitutes such a system of random selection within the meaning of § 309(i). The regulations require the use of a lottery in the case of a tie. No exercise of agency discretion is involved. More importantly, deadlocks are made more likely by the limited point system employed to assess competing applicants; by initially limiting the relevant factors to a handful of single digit ratings (only whole number scores from 1 to 14 are mathematically possible) the Commission's scheme itself contributes to a greater need for a tie-breaker lottery. One would expect that the wider the range of relevant factors considered in comparative hearings the less frequently ties will occur. Thus, the ITFS selection procedure appears to constitute a "system of random selection" purposely designed to by-pass the time and resource consuming process of traditional comparative hearings. As such, it is something more than the merely *ad hoc* device for avoiding arbitrary decision-making the Commission claims.[21]

The FCC cites Black's Law Dictionary, which defines "system" as an "orderly combination or arrangement, as of particu-

waited so long—until after specific lottery legislation had been sought and enacted—to come up with the interpretation that it had tie-breaker authority to begin with.

**20.** The Commission, in its brief, makes the *post hoc* argument that § 309(i) can not apply to the tie-breaker situation because it established a particular kind of lottery system for use only in situations where it is not feasible to conduct any type of comparative proceedings. The Commission claims that § 309(i) sets up a procedure whereby the Commission "screens the applications for facial acceptability for filing, conducts the lottery among the mutually exclusive applications, and thereafter ascertains whether the winning applicant is fully qualified to be a Commission licensee." FCC Brief at 33 (citing 47 U.S.C. § 309(i)(1), (2)). If only this one particular type of lottery system were mandated by the statute, the FCC's structural argument—that § 309(i)(3)(A)'s limitation to "any system of random selection *under this subsection"* excludes the ITFS lottery—might have merit, because un-

der the ITFS system applicant qualifications are assessed and compared before the random drawing is made. However, § 309(i)(2)(C) itself does not require that qualifications be assessed as a secondary matter. The statute says only that "the Commission *may ...* omit the determination" of qualifications of applicants who lost the lottery. The statute's language is broad enough to encompass the ITFS type of random selection system where the Commission chooses to assess and compare qualifications before instead of after conducting a lottery.

**21.** We are unpersuaded by the argument that the lottery is only rarely used by the Commission. FCC counsel noted at oral argument that in granting 507 ITFS licenses since June 1985, it had never had to resort to a lottery. This statistic alone is not particularly revealing because the major effect of a lottery may be in spurring closely competing applicants to settle and thereby keep some control over their destinies rather than surrender to blind chance. At any rate, this systematic use of a lottery is either autho-

lars, parts, or elements into a whole...." Black's Law Dictionary 1621 (4th ed. rev. 1968). It reasons that this definition indicates that "a random selection system is not being employed when a lottery is not contemplated at the outset of a proceeding and is used only as a last resort to resolve a deadlocked comparative proceeding." 49 Fed.Reg. at 49,467, J.A. at 270. The ITFS rules, however, *do* contemplate a lottery at the outset of the proceeding. They say that lotteries "will" be applied in ties and the truncated rating system itself makes ties likely.

The Commission also argues from § 309(i)'s language that tie-breaker lotteries must be immune from § 309(i)'s preference requirement because to apply such a requirement "could create the anomalous result of according diversity or minority preferences in a lottery, even though the Commission after a full hearing applied such preferences in finding the rival applicants equally qualified." *Id.* Whatever merit this argument may have in the abstract, it is irrelevant in reality; the Commission expressly declined to include any minority preference in its ITFS selection criteria and grants only a small bonus for general diversity of ownership.[22] Thus, the statutory preferences are not duplicated in this scheme. It may be that a valid lottery under § 309(i) could be held without duplicating preferences already incorporated into the comparative rating scheme but that case is not before us.

### B.

The Commission next turns to the legislative history of § 309(i) to show that it was not meant to cover a tie-breaker lottery that is a supplement to, not a substitute for, traditional comparative hearings. It relies on the legislative history of the 1981 and 1982 lottery amendments for this interpretation, pointing to the second statute's conference report's statement that the amendment was "intended to alleviate many of the delays and burdensome costs faced by both applicants and the Commission in an initial comparative licensing proceeding with mutually exclusive applicants." *Communications Amendments Act of 1982*, H.R.Conf.Rep. No. 765, 97th Cong., 2d Sess. 37 (1982), U.S.Code Cong. & Admin.News 1982, p. 2281.[23]

During passage of the first lottery bill in 1981, Congress and the Commission both focused their attention primarily on the use of lotteries as total substitutes for traditional time-consuming comparative hearings. The Chairman of the FCC testified that the lottery bill as initially proposed "would permit the Commission to dispense with comparative hearings...." *Hearings Before the Subcomm. on Communications of the Senate Comm. on Commerce, Science and Transportation*, S. 601, 97th Cong., 1st Sess. 7 (1981) (statement of Robert E. Lee, Acting Chairman, FCC). *See also id.* at 21 ("By reviewing basic qualifications and eliminating comparative hearings, we could eliminate much of the delay and expense with little or no adverse effect on the final provision of television service."). The House and Senate conferees agreed that the 1981 amendment authorized the "elimination of intial comparative

---

rized or not, and the Commission's frequency of use is not relevant.

**22.** *See* Second Report and Order, 101 F.C.C.2d at 71, J.A. at 22 (rejecting point award for minority applicants). *See also* 59 Rad.Reg.2d (P & F) at 1373, J.A. at 73. *Compare id.* at 1371, J.A. at 71, *with* H.R. Conf.Rep. No. 765, 97th Cong., 2d Sess. 37 (1982), U.S.Code Cong. & Admin. News 1982, p. 2281.

**23.** The ITFS licensing scheme, however, is itself a substitute for traditional comparative hearings. The Commission, in fact, has admitted that the hybrid system of paper hearing plus lottery, which it adopted for ITFS licensing, avoids the expense and delay of traditional comparative hearings almost as well as a pure lottery:

[T]he point system adopted in this Order will result in the expeditious processing of mutually exclusive applications and the speed with which a lottery would result in selection would not be significantly faster, if at all. *Second Report and Order*, 101 F.C.C.2d at 68, J.A. at 19. Thus, the abbreviated system adopted by the Commission does not employ lotteries only to establish a rational basis for choice in deadlock situations, but also to enhance the efficiency of licensing proceedings because full-blown comparative hearings are not "worth the candle."

hearings." *Omnibus Budget Reconciliation Act,* H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 897 (1981), U.S.Code Cong. & Admin.News 1981, pp. 396, 1259.

After the 1981 amendment was passed, granting the Commission authority to use a system of random selection to choose among competing applicants, the Commission objected to that part of the provision which allowed use of lotteries only "after determining the qualifications of each such applicant under section 308(b)." 47 U.S.C. § 309(i)(1) (1982 Supp.) (repealed 1982).[24] The Commission had initially requested the authority to conduct a lottery before passing on the applicants' qualifications, *Hearings* at 10, and renewed this request in refusing to implement the 1981 amendment. The Commission reasoned that the requirement that each applicant's qualifications be examined before any lottery took place fatally undermined its ability to avoid the costs and delays of processing numerous applications.

During deliberations on the Commission's proposed 1982 amendments, however, commentators along with the Commission itself assumed that the 1981 lottery authority authorized lotteries that were supplements to, not just complete substitutes for, comparative hearings. For example, in the abortive FCC rulemaking on implementing the 1981 lottery amendment, the Corporation for Public Broadcasting claimed the 1981 amendment would not allow the Commission to eliminate consideration of the comparative qualifications of noncommercial applicants but suggested that it might authorize tie-breakers in the public television context. *Report and Order,* 89 F.C.C.2d 257, 261 (1982). Another group of commentators argued that lotteries need not be used as a total substitute for comparative hearings; the Commission, they argued could hold "paper hearings"

and turn to a lottery as a "last resort." *Id.* at 267–68.

The Commission itself, in discussing the problems involved in assessing the 308(b) qualifications of each applicant, stated its view that the 1981 amendment provided authority for tie-breaker lotteries:

> The effect of this new authority would be to enable the ALJ to declare that the licensee could be selected from among the "dead-locked" applicants (*i.e.,* that there is no material public interest basis for selecting one over another) by a lottery.

*Id.* at 279.

And finally, in reviewing the history of the 1981 amendment, Congress asserted that it applied to "[*a*]*ny* use of a lottery system." H.R. Conf.Rep. No. 765, 97th Cong., 2d Sess. 23 (1982), U.S.Code Cong. & Admin.News 1982, p. 2267 (emphasis added).

In enacting the 1982 amendment Congress did nothing to contradict this inclusive view of the intended scope of its lottery statute. Rather Congress gave the Commission the power to establish any kind of lottery system or systems it found necessary to deal with the unique problems involved in licensing different services.

Moreover, after Congress enacted the 1982 amendment, the Commission actually did propose a *tie-breaker* lottery with preferences under § 309(i). *Second Notice of Proposed Rulemaking,* 91 F.C.C.2d 911, 913 (1982). Specifically, it proposed the use of tie-breaker lotteries in any area "where the qualifications of competing applicants are so close that no material difference between the parties' ability to serve the public interest can be distinguished." *Id.* at 913. Similarly, the FCC formally concluded in its *Second Report and Order,* 93 F.C.C.2d 952, 959 (1983), that § 309(i) included tie-breaker authority.

---

**24.** Section 308(b) states the minimum conditions for licensees:

> All applications for station licenses, or modifications or renewals thereof, shall set forth such facts as the Commission by regulation may prescribe as to citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station; the ownership and location of the proposed sta-

tion and of the stations, if any, with which it is proposed to communicate; the frequencies and the power desired to be used; the hours of the day or other periods of time during which it is proposed to operate the station; the purposes for which the station is to be used; and such other information as it may require....

47 U.S.C. § 308(b).

We have analyzed the arguments that have been raised and concluded that the language of both the statute and the *Conference Report* permits the use of *ad hoc* lotteries in "tied" cases.

*Id.* The Commission decided, however, not to implement its proposed tie-breaker lottery at that time because it wanted to deliberate further on procedures for identifying ties and breaking them. *Id.*

Having sought broad authority to conduct a variety of random selection procedures and having acknowledged that the 1982 authority included tie-breaker lotteries, the Commission is now in a poor position to ignore the conditions upon which

Congress granted that authority.[25] If an agency seeks authority, even clarifying authority, from Congress, and Congress grants it conditioned upon certain provisions, the agency may not ignore these requirements. Therefore, the FCC's explicit conclusion that the ITFS "random chance tie-breaker need not follow the provisions of the lottery statute" is simply incorrect. 51 Fed.Reg. at 9797, J.A. at 90. The 1982 statute clearly mandates minority and media ownership diversity preferences in *any* system of random selection. *See* 47 U.S.C. § 309(i)(3).[26]

In contrast, the decision of what kind of lottery system to establish in what circum-

---

**25.** According to a venerable canon of statutory construction, unless there is *"clear* intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* — U.S. —, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987) (quoting *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976) (quoting *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) (emphasis added))). *See also Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980) ("a more specific statute will be given precedence over a more general one"). In *Crawford Fitting,* the Court rejected the claim that general authority to allow the payment of costs under Federal Rule of Civil Procedure 54(d) authorized the payment of expert witness fees in excess of the limitations contained in the specific witness fee provision of 28 U.S.C. § 1821. Similarly, in this case, we reject a reading of the 1934 Communications Act which would allow the FCC to evade the express limiting conditions of § 309(i). To infuse the general public interest provisions of the 1934 Act with the authority to conduct lotteries at this late date would allow them to control the scope of the more specific 1982 amendment, which addresses *"any* system of random selection," and thereby do violence to this well-recognized principle of statutory construction.

This canon applies to subsequently enacted, more specific statutes that limit the authority of a federal agency. For example, the Tenth Circuit recently held that the specific 1938 statute granting the Department of Interior authority to contract with private entities for the development and sale of surplus water power in a particular project and under certain conditions took precedence over the Federal Energy Regulatory Commission's general licensing jurisdiction over hydroelectric facilities under the Federal Water Power Act of 1920. *Uncompahgre Valley Water Users Ass'n v. FERC,* 785 F.2d 269 (10th Cir.), *cert. denied sub nom. Town of Nor-*

*wood v. Uncompahgre Valley Water Users Ass'n,* — U.S. —, 107 S.Ct. 112, 93 L.Ed.2d 60 (1986). Similarly, here the FCC's general regulatory authority is limited by the subsequent enactment purporting to grant new power but under specified conditions.

We reject the contention that this reading of the 1982 amendment constitutes a disfavored repeal by implication because it would be unreasonable to expect Congress in 1982 to foresee the Commission's future intent, contrary to its consistent practice for over 5 decades, to claim public interest authority for tie-breaker lotteries.

**26.** The legislative history also demonstrates an extremely strong commitment by Congress to minority and media diversity preferences. It is replete with references to the overriding importance of preferences for the underrepresented in the media. *See e.g.,* Omnibus Budget Reconciliation Act of 1981, H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 896–97 (1981), U.S.Code Cong. & Admin.News 1981, pp. 1258, 1259. The Commission initially resisted the random selection system, in part because of the preferences, refusing to implement rules for a generic lottery as required by the statute. H.R.Conf.Rep. No. 765, 97th Cong., 2d Sess. 24 (1982), U.S.Code Cong. & Admin.News 1982, p. 2268. Congress responded to most of the FCC's concerns in the 1982 amendments but refused to eliminate preferences and, in fact, required an even more detailed preference system. The 1982 Conference Report also provided an in-depth analysis of how the preference requirement should operate; suggesting factors relevant to when a lottery should be used, *id.* at 37, U.S.Code Cong. & Admin.News 1982, p. 2281, outlining how qualifications should be examined, *id.* at 39, U.S.Code Cong. & Admin.News 1982, p. 2283, and devoting 9 pages exclusively to the technicalities of implementing the preferences. By bending on some issues but strengthening the requirement that all lotteries include preferences to foster diversification of viewpoints, Congress

stances clearly lies within the discretion of the Commission. The 1982 *Conference Report* lists criteria for the Commission to consider in making such decisions but these factors do not rise to the level of statutory requirements binding on the Commission. As long as the use of some form of random selection lottery is "appropriate in the public interest," the "use of a lottery system ... is discretionary with the Commission." H.R.Conf.Rep. No. 765, 97th Cong., 2d Sess. 37 (1982), U.S.Code Cong. & Admin. News 1982, p. 2281. In short, if an *ad hoc* lottery would be in the public interest, then the Commission may use one under the 1982 amendment but it must incorporate the preferences that are mandated by the statute.

Accordingly, we vacate the ITFS lottery rule and remand for the Commission to reconsider its authority under § 309(i) to conduct tie-breaker lotteries in ITFS licensing proceedings. The Commission has previously determined that the ITFS situation was not appropriate for § 309(i) lotteries. But this determination was based on a strict construction of the criteria set forth in the *Conference Report* as binding and was made at a time when the Commission believed it had inherent authority to establish a tie-breaker lottery outside of § 309(i)'s limitations. *Second Report and Order*, 101 F.C.C.2d at 67, J.A. at 18; *Memorandum Opinion and Order*, 51 Fed.Reg. at 9797, J.A. at 90. In light of our interpretation of § 309(i) [27] as governing all lotteries, tie-breaker or otherwise, employed on a systematic basis, the Commission must reconsider whether the kind of lottery it wishes to employ in ITFS proceedings is in the public interest. Any such lottery must conform to § 309(i) standards.

*Remanded.*

left little doubt that it did not want strictly random lotteries.

27. Although the issue was not briefed or argued before us, we note in passing that § 309(i) requires that regulations be adopted within 180 days of its enactment, September 13, 1982. 47

U.S.C. § 309(i)(4)(A). The statute also grants the Commission "authority to amend such rules from time to time to the extent necessary to carry out the provisions of this subsection." 47 U.S.C. § 309(i)(4)(B).