THACKER, Circuit Judge,
concurring:
I concur in the majority’s opinion but write separately for three reasons: (1) I would not consider remarks made by candidate Trump before he took his presidential oath of office; (2) I would nonetheless find that Appellees have demonstrated a likelihood of success on the merits of their argument that Section 2(c) of the Second Executive Order (“EO-2”) violates the Establishment Clause, based solely on remarks made or sentiments expressed after January 20, 2017; and (3) I would conclude Appellees have demonstrated a likelihood of success on the merits of their argument that Section 2(c), as it applies to immigrant visas, violates 8 U.S.C. § 1152(a)(1)(A) of the Immigration and Nationality Act (“INA”).
I.
I agree with the majority’s conclusion that Appellees have standing to challenge the constitutionality of § 2(c) of EO-2 and that EO-2 likely violates the Establishment Clause. However, in my view, we need not—-and should not—reach this conclusion by relying on statements made by the President and his associates before inauguration.
While on the campaign trail, a non-incumbent presidential candidate has not yet taken the oath to “preserve, protect and defend the Constitution,” U.S. Const. art. II, § 1, and may speak to a host of promises merely to curry favor with the electorate. Once a candidate becomes President, however, the Constitution vests that individual with the awesome power of the executive office while simultaneously imposing constraints on that power. Thus, in undertaking the Establishment Clause analysis, I believe we should focus our attention on conduct occurring on President Trump’s inauguration date, January 20, 2017, and thereafter. Indeed, for the reasons below, looking to pre-inauguration conduct is neither advisable nor necessary.
A.
In confining my analysis to post-inauguration statements and actions, I do not draw on a blank slate. To begin, “the Establishment Clause protects religious expression from governmental interference.” Mellen v. Bunting, 327 F.3d 355, 376 (4th Cir. 2003) (emphasis supplied). To this end, Establishment Clause jurisprudence has focused on government action rather than “a[ ] judicial psychoanalysis” of individuals. McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 862, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). We have neither the right nor the ability to peer inside an official’s “heart of hearts”; indeed, we will “not look to the veiled psyche of government officers”— much less that of candidates for public office—to divine the purpose of a law. Id. at 862-63, 125 S.Ct. 2722.
The Government relies on the doctrines of executive privilege and presidential immunity to contend that EO-2 is essentially unreviewable, arguing that courts “should not second-guess the President’s stated purpose by looking beyond the policy’s text and operation,” and that we should instead apply a “presumption of regularity” to his actions. Appellants’ Br. 45 (quot *631 ing United States v. Chem. Found., Inc., 272 U.S. 1, 14-15, 47 S.Ct. 1, 71 L.Ed. 131 (1926)). While I do not agree with this proposition for the reasons ably set forth by Chief Judge Gregory, I do believe the Supreme Court’s decisions in the executive privilege and immunity context support confining our review to statements by the President and his administration made after the inauguration, once the President began operating pursuant to Article II. Those decisions explain that the judiciary’s ability to probe official, presidential conduct is related to his discharge of official power. See Clinton v. Jones, 520 U.S. 681, 703, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (“[W]e have long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law.” (emphasis supplied)); cf. Cheney v. U.S. Dist. Court for D.C., 542 U.S. 367, 381, 124 S.Ct. 2576, 159 L.Ed.2d 459 (2004) (“It is well established that ‘a President’s communications and activities encompass a vastly wider range of sensitive material than would be true of any ordinary individual.’ ” (quoting United States v. Nixon, 418 U.S. 683, 715, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)) (emphasis supplied)). Indeed, the executive privilege—and, by that token, the separation of powers—applies where the President operates within the executive’s core constitutional powers. See Nixon, 418 U.S. at 708-09, 94 S.Ct. 3090. It follows that a president’s conduct after he takes office, but not before, carries the imprimatur of official “government” action, and can only then be considered “government interference” under the Establishment Clause. Mellen, 327 F.3d at 376.
B.
For more practical reasons, we should also hesitate to attach constitutional significance to words a candidate utters on the campaign trail. Campaign speeches are inevitably scattered with bold promises, but once the dust settles after an election— when faced with the reality of the office and with benefit of wise counsel—a newly inducted public official may act with a different philosophy. Presidents throughout history have dialed back or even reversed campaign promises.[1] To be sure, the President’s statements regarding Islam before assuming office reveal religious animus that is deeply troubling. See, e.g., J.A. 346 (“Donald J. Trump Statement on Preventing Muslim Immigration,” dated December 7, 2015).[2] Nonetheless, I do not adhere to the view that we should magnify our analytical lens simply because doing so would support our conclusion, particularly when we need not do so.
II.
Even without focusing on any campaign rhetoric, the record in this case amply demonstrates the primary purpose of EO-2 *632 was to ban Muslims from entering the United States in violation of the Establishment Clause. I would thus base our Establishment Clause analysis on the morphing of the First Executive Order (“EO-1”) into EO-2, the statements of presidential representatives and advisors, the lack of evidence supporting a purported national security purpose, and the text of and logical inconsistencies within EO-2.
The Government argues that we should simply defer to the executive and presume that the President’s actions are lawful so long as he utters the magic words “national security.” But our system of checks and balances established by the Framers makes clear that such unquestioning deference is not the way our democracy is to operate. Although the executive branch may have authority over national security affairs, see Munaf v. Geren, 553 U.S. 674, 689, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (citing Dep’t of Navy v. Egan, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988)), it may only exercise that authority within the confines of the law, see Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 645-46, 654-55, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring); and, of equal importance, it has always been the duty of the judiciary to declare “what the law is,” Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).
A.
The President issued EO-1 on January 27, 2017. See Exec. Order 13,769, Protecting the Nation From Foreign Terrorist Entry Into the United States, 82 Fed. Reg. 8977 (Jan. 27, 2017). EO-1 banned citizens of seven majority Muslim nations—Libya, Iran, Iraq, Somalia, Syria, Sudan, and Yemen—from entering the United States. The ban applied to over 180 million Muslims, or just over 10% of the world Muslim population, and was executed without input from relevant cabinet officials. Indeed, the President actively shielded certain officials from learning the contents of EO-1: per then-acting Attorney General Sally Yates, the administration advised “the Office of Legal Counsel ... not to tell the attorney general about [EO-1] until after it was over.” Full Transcript: Sally Yates and James Clapper testify on Russian election interference, Wash. Post (May 8, 2017), https://www. washingtonpost.com/news/post-politics/wp/ 2017/05/08/full-transcript-sally-yates-and-james-clapper-testify-on-russian-election-interference (saved as ECF opinion attachment).
As Rudy Giuliani, an advisor to the President, explained on January 28, 2017, EO-1 did all this with the purpose of discriminating against Muslims. Giuliani was quite clear that the President wanted to enact a “Muslim ban” and had assembled a commission to study how to create a “Muslim ban” legally. J.A. 508. Per Giuliani, EO-1 was the President’s attempt at a legal “Muslim ban.” Id.[3]
To further this goal, EO-1 suspended the entry of refugees for 120 days but *633 directed the Secretary of State “to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual’s country of nationality.” EO-1, § 5(b). The President explained that this exception was designed to give Christians priority in entering the United States as refugees. He said that in Syria,
If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them.
J.A. 462 (emphases supplied).[4] The statements of the President, his advisor, and the text of EO-1 made crystal clear a primary purpose of disfavoring Islam and promoting Christianity.
After the Ninth Circuit upheld the stay of EO-1, the President set about to issue a new executive order. But significantly, in revising the order, the éxecutive branch did not attempt to walk away from its previous discriminatory order. Instead, it simply attempted to effectuate the same discrimination through a slightly different vehicle—the proverbial wolf in sheep’s clothing. Indeed, Press Secretary Sean Spicer confirmed that “[t]he principles of the executive order remain the same,” J.A. 379,[5] and the President’s Senior Policy Ad-visor, Stephen Miller, described the changes in the new order as “mostly minor technical differences,” id. at 339.
B.
The President issued EO-2 on March 6, 2017. See Exec. Order 13,780, Protecting the Nation From Foreign Terrorist Entry Into the United States, 82 Fed. Reg. 13209 (Mar. 6, 2017). Like its predecessor, EO-2 lacks evidentiary support, is logically inconstant, and evinces an intent to discriminate against Muslims.
1.
First, the Government offers very little evidence in an attempt to support the President’s ban of approximately 180 million people. EO-2 claims, “hundreds of persons bom abroad have been convicted of terrorism-related crimes in the United States” but cites only two such examples, each of which is weakly related, if at all, to the purported purpose of EO-2. EO-2, § 1(h). One example is from Iraq, but, as Iraq is not part of EO-2, it does not support this ban at all. The other example involves a child brought to the United States as a two-year-old. As this two-year-old was ultimately radicalized in the Unit *634 ed States and not abroad, this case is unrelated to better screening and vetting—the purported purpose of EO-2. See Br. for Cato Institute as Amicus Curiae Supporting Appellees at 12-13, Int’l Refugee Assistance Project v. Trump, No. 17-1351 (4th Cir. argued May 8, 2017; filed Apr. 19, 2017), ECF No. 185; EO-2, § 1(a), (h).
In sharp contrast to the dearth of evidence to support the purported purpose of EO-2, 42 bipartisan former national security officials concluded EO-2 “bear[s] no rational relation to the President’s stated aim of protecting the nation from foreign terrorism.” Corrected Br. for Former National Security Officials as Amici Curiae Supporting Appellees at 4, Int’l Refugee Assistance Project v. Trump, No. 17-1351 (4th Cir. argued May 8, 2017; filed Apr. 13, 2017), ECF No. 126. In addition, since the issuance of EO-1, a report by the Department of Homeland Security has found that “country of citizenship is unlikely to be a reliable indicator of potential terrorist activity,” likewise undermining any purported security justification for the Order. J.A. 419.
2.
The Government’s untenable position is made even worse by the fact that the Government’s purported justification for EO-2 does not logically support the ban it created. EO-2 reasoned that people coming from the six banned countries posed an increased risk of committing terrorist acts because, according to the Department of State’s Country Reports on Terrorism 2015 (the “Country Reports”), “each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones,” and were unwilling or unable “to share or validate important information about individuals seeking to travel to the United States.” EO-2, § 1(d); see § 1(e) (citing Country Reports). However, given these conditions as the reason for the ban, and based on the Country Reports, two other majority Christian countries—Venezuela and the Philippines—should have logically been included. See U.S. Dep’t of State, Bureau of Coun-terterrorism and Countering Violent Extremism, Country Reports on Terrorism 2015 78-85, 297-98, 308-09, 314-15, 352, 380 (June 2016), https://www.state.gov/ documents/organization/258249.pdf (excerpts saved as ECF opinion attachment). Neither country is willing and able to help the Government verify information about people attempting to travel to the United States, and both countries have terrorist organizations operating within their boundaries. Therefore, applying the Government’s logic, the potential of a terrorist act from a national of Venezuela or the Philippines would also justify a blanket ban on all nationals from these countries. Interestingly, however, the CIA World Factbook reports that Venezuelan population is, at most, 2% Muslim, and the Philippine population is 5% Muslim. See Cent. Intelligence Agency, Field Listings: Religions, World Factbook, https://www.cia. gov/library/publications/the-world-factbook/fields/2122.html (last visited May 23, 2017) (saved as ECF opinion attachment). Thus, the Government has not consistently applied the criteria it claims it used, and the reason seems obvious—and inappropriate.
Moreover, if the conditions in the six countries subject to EO-2 truly motivated the Government’s travel ban, the Government would have based its ban on contact with the listed countries, not nationality. Under EO-2, a person who is a citizen of Syria would not be allowed to enter the United States even if they had never set foot in Syria. However, a person who lived *635 his or her whole life in Syria but never obtained Syrian citizenship, and had even recently lived near terrorist-controlled regions of Syria, would be unaffected and freely allowed to enter the United States.[6] As a result, EO-2 is at once both overinclu-sive and underinclusive and bears no logical relationship to its stated objective.
Last, but by no means least, EO-2 identifies and discriminates against Muslims on its face. It identifies only Muslim majority nations, thus banning approximately 10% of the world’s Muslim population from entering the United States. It discusses only Islamic terrorism. And, it seeks information on honor killings—a stereotype affiliated with Muslims[7]—even though honor killings have no connection whatsoever to the stated purpose of the Order.[8]
C.
All of this evidence—arising after January 20, 2017—leads to only one conclusion: the principal motivation for the travel ban was a desire to keep Muslims from entering this country. EO-2 does not pass constitutional muster. Our constitutional system creates a strong presumption of legitimacy for presidential action; however, this deference does not require us to cover our eyes and ears and stand mute simply because a president incants the words “national security.” The Constitution and our system of democracy requires that we ensure that any and every action of the President complies with the protections it enshrines.
III.
Finally, I would conclude Appellees have demonstrated a likelihood of success on the merits of their argument that Section 2(c) of EO-2, as it applies to immigrant visas, violates 8 U.S.C. § 1152(a)(1)(A) of the INA.[9]
Section 1182(f) of Title 8 states that the President may “suspend the entry of all aliens or any class of aliens” “for such period as he shall deem necessary” when the President finds that such entry “would be detrimental to the interests of the United States.” However, § 1152(a)(1)(A), which was promulgated after § 1182(f), states that no person seeking an immigrant visa[10] “shall ... be discriminated against” on the basis of “nationality.” To be sure, EO-2 discriminates on the basis of *636 nationality, suspending entry of “nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen” (the “Designated Countries”). EO-2, § 2(c). The crux of the Government’s argument, however, is that § 1152(a)(1)(A) does not prevent the President, acting pursuant to his § 1182(f) authority, from suspending entry based on nationality, even if that suspension necessarily mandates the denial of immigrant visas based on nationality. This is nonsensical. I find this argument to contravene longstanding canons of statutory construction as well as the text and effect of EO-2 itself.
A.
Our jurisprudence gives ample guidance for a situation in which two statutes conflict with one another. But the Government believes § 1182(f) and § 1152(a)(1)(A) do not conflict at all. Instead, the Government posits that the two statutes “address different activities handled by different government officials.” Appellants’ Br. 31 (internal quotation marks omitted). The Government thus believes the specific visa denial warranted by EO-2 falls squarely within the broad ambit of § 1182(f).
I will first address whether we are faced with any real conflict between these provisions. “When two acts touch upon the same subject, both should be given effect if possible.” United States v. Mitchell, 39 F.3d 465, 472 (4th Cir. 1994) (citation omitted). And “[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.” Food & Drug Admin. v. Brown & Williamson Tobacco. Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (internal quotation marks omitted). We must “fit, if possible, all parts into an harmonious whole.” Id. (quoting FTC v. Mandel Bros., Inc., 359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959)). In this vein, 8 U.S.C. § 1201(g) provides, “No visa ... shall be issued to an alien ... ineligible to receive a visa ... under section 1182....” Thus, when a President suspends entry to a national from a Designated Country and renders him inadmissible under § 1182(f), there is a strong argument that the alien must be denied a visa. See generally 8 U.S.C. § 1182 (titled “Inadmissible aliens”). To conclude that the two statutes operate independently and deal with totally separate executive functions would be to ignore this link.
Furthermore, although the Government contends the provisions at issue do not touch upon the same subject—asserting that the visa issuance process is a “different activity” than suspension of entry—its own arguments and the text and operation of EO-2 belie this notion.
EO-2 directs that the entry of nationals of the Designated Countries be suspended, but the Government admits the Department of State will “implement th[e] suspension [of entry] by declining to issue visas to aliens who are covered by the Order and who are not found eligible for a waiver.” Appellants’ Br. 34 n.12 (emphasis supplied); see also J.A. 729 (Government counsel admitting immigrant visa applicants “will be denied a visa if they are a national from the listed country”). EO-2 also delineates who is entitled to or restricted from entry based on one’s visa status. See EO-2, § 3(a) (defining the scope of entry suspension to those outside the United States on the effective date of the order who “did not have a valid visa” on the date of the now-revoked first executive order; and “do not have a valid visa” as of the effective date of EO-2). Further, the Government offers the precarious justification that “when an alien subject to [EO-2] is denied an immigrant visa, he is not suffering discrimination on the basis of *637 nationality of the sort prohibited by Section 1152(a)(1)(A); instead, he is being denied a visa because he has been validly barred from entering the country.” Appellants’ Br. 33. Following this circular logic, an alien is barred from entry because he does not have and cannot attain a visa, but he is denied a visa because he is barred from entry. It is clear that in EO-2, the visa issuance and entry concepts are intertwined to the point of indistinguishability.[11]
The Government also contends It would be a “fruitless exercise” and would “make no sense” to enable issuances of immigrant visas pursuant to § 1152(a)(1)(A), when those aliens receiving the visas would nonetheless be barred from entering the United States once they reach our borders. Appellants’ Br. 31, 35. I fail to see how permitting a national of one of the Designated Countries to continue with her immigrant visa process would be fruitless, unless, of course, the Government intends to use the ban as a gateway to a much more permanent ban, ultimately sweeping in those nationals whose processes were halted by the order. See Section 1(a) (stating that a “Policy and Purpose” of the EO-2 is to improve the protocols and procedures “associated with the visa-issuance process”). Moreover, being a visa holder, even if one may be temporarily inadmissible, carries with it a certain status with regard to EO-2. See, e.g., EO-2, § 3(c) (suggesting that one receiving a visa from U.S. Customs and Border Protection during the protocol review period could gain entry to the United States).
I likewise fail to see how allowing one to continue with her incipient visa process would “make no sense,” when that national could be one step closer to ultimately reuniting with her loved ones. For example, in the case of John Doe #1, his wife could conceivably proceed with her visa application interview, obtain her visa, and once the protocol review period has ended, join her husband in the United States as soon as possible thereafter, quickly redressing John Doe #l’s constitutionally cognizable injury of being separated from an immediate family member.
For all of these reasons, I would reject the Government’s argument that § 1152(a)(1)(A) and § 1182(f) operate in separate statutory spheres. I believe § 1152(a)(1)(A)’s prohibition limits the President’s § 1182(f) authority in the issuance of EO-2. As the Government itself mentioned in its opening brief, “courts judge the legitimacy of a law by what it says and does.” Appellants’ Br. 2. Here, the ultimate effect of what EO-2 actually does is require executive agencies to deny visas based on nationality.
Therefore, I next turn to the traditional canons of statutory construction to determine how to resolve this tension between § 1182(f) and § 1152(a)(1)(A). I approach this analysis mindful that the executive branch’s authority over immigration affairs is conferred and cabined by Congress. See Abourezk v. Reagan, 785 F.2d 1043, 1061 (D.C. Cir. 1986) (The Executive’s “broad discretion over the admission and exclusion of aliens ... extends only as far as the statutory authority conferred by Congress.”).
B.
When faced with provisions that appar-éntly conflict, we must give effect to each provision, with a later enacted, more specific statute trumping an earlier, more general one. See Radzanower v. Touche *638 Ross & Co., 426 U.S. 148, 153, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); Morton v. Mancari, 417 U.S. 535, 550-51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (“[A] specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.”); Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 633, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973) (“[A]ll parts of a statute, if at all possible, are to be given effect.”).
First, § 1152(a)(1)(A) must be given effect. Reading § 1182(f) as bestowing upon the President blanket authority to carry out a suspension of entry, which involves rejecting a particular country’s immigrant visa applications as a matter of course, would effectively nullify the protections in § 1152(a)(1)(A) and create an end-run around its prohibitions against discrimination. It would collapse the statutory distinction between entry and visa issuance, see 8 U.S.C. § 1201(h) (“Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted [to] the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law.”), and ultimately allow the chief executive to override any of Congress’s carefully crafted visa criterion or grounds for inadmissibility.
Second, § 1182(f) was enacted in 1952, but § 1152(a)(1) was enacted in 1965 as part of a sweeping amendment of the INA. We assume that “when Congress enacts statutes, it is aware of relevant judicial precedent.” Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 648, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010). Thus, we must accept that Congress knew about the President’s broad authority in § 1182(f) when it enacted § 1152(a)(1)(A), and the latter lists several exceptions, none of which include the former. See § 1152(a)(1)(A) (exempting §§ 1101(a)(27), 1151(b)(2)(A)©, and 1153). Section 1152(a)(1)(A) is also more specific, applying to demarcated types of discrimination and a certain type of visa. See Radzanower, 426 U.S. at 153, 96 S.Ct. 1989 (preference should be given to statute involving a “narrow [and] precise ... subject”).
Finally, the Government’s suggestions of potential statutory discord are unconvincing. For example, the Government relies on 8 U.S.C. § 1185(a)(1), which makes it unlawful for any alien to enter the United States “except under such reasonable rules, regulations, and orders, and subject to such limitations” prescribed by the President. But this provision merely acts as an implementation provision flowing from § 1182(f), which, as stated above, is limited by § 1152(a)(1)(A). In addition, § 1152(a)(1)(B) is of no concern to this analysis given that it applies to the Secretary of State, and § 2(c) of EO-2 bars visa issuance to nationals of the Designated Countries, rather than regulating visa processing locations.
C.
For these reasons, I find Appellees’ statutory argument that EO-2 violates § 1152(a)(1)(A) because it requires the denial of immigrant visas on the basis of nationality the more compelling argument. Therefore, I would conclude that Appellees have shown a likelihood of success on the merits on this point. I otherwise join Judge Keenan’s opinion, with the exception of Part II.A.i.
IV.
In conclusion, I believe the district court’s injunction should be affirmed based on the majority’s Establishment Clause conclusion, although I would do so based only on consideration of post-inauguration conduct. I also believe that the plaintiffs *639 will likely succeed on the merits of their argument that EO-2 violates the INA for the reasons stated by Judge Keenan and set forth in Part III of this opinion.

. Indeed, many might argue that this President has repeatedly and regularly dialed back or reversed course on his campaign promises. See, e.g., Priya Krishnakumar et al., Tracking President Trump’s Campaign Promises, L.A. Times (Apr. 26, 2017), http://www.latimes. com/proj ects/la-na-pol-trump-100-days-promises/ (reporting President Trump has “scaled back” or "abandoned” 9 out of 31 campaign promises) (saved as ECF opinion attachment).

. Given that they were made on the campaign trail, I do not consider as part of my analysis the President's campaign website’s archived statements about the plan to ban all Muslims from entering the United States. However, I must note it is peculiar that those statements were removed shortly before we began hearing arguments in this case. See Dan Merica, Trump campaign removes controversial Muslim ban language from website, CNN (May 8, 2017, 3:37 PM), http://www.cnn.com/2017/05/ 08/politics/trump-muslim-ban-campaign-website/ (saved as ECF opinion attachment).

. Giuliani is purportedly a member, and claims to be chairman, of an expert legal commission assembled to study how to create a lawful way to ban Muslims from entering the country and an acknowledged advisor to the President. See J.A. 508-09. Courts routinely analyze statements and reports from presidential commissions such as the one of which Giuliani is a member. See, e.g., Bartnicki v. Vopper, 532 U.S. 514, 533, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) (citing and quoting President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 202 (1967) to demonstrate importance of privacy in communications); Osborne v. Ohio, 495 U.S. 103, 111, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (citing Attorney General's Commission on Pornography to establish state's interest in punishing child pornography possession).

. Presidential statements necessarily shed light on executive policy. See, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry, — U.S. —, 135 S.Ct. 2076, 2081, 192 L.Ed.2d 83 (2015) (using presidential statement to show United States’ position on status of Jerusalem); Clinton v. City of New York, 524 U.S. 417, 495-96, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (Breyer, J., dissenting) (relying on presidential statements to demonstrate effect of Line Item Veto Act).

. When relevant, the press secretary and other White House Official’s statements can represent official government position. See, e.g., Reynolds v. United States, 565 U.S. 432, 132 S.Ct. 975, 984, 181 L.Ed.2d 935 (2012) (citing to the Office of the Press Secretary to show President’s position on registration of sex offenders who committed offenses before enactment of the Adam Walsh Child Protection and Safety Act of 2006); Hamdi v. Rumsfeld, 542 U.S. 507, 549, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (relying on Office, of the White House Press Secretary’s statement to identify official executive policy).

. Syrian citizenship is not based on country of birth. See Legislative Decree 276—Nationality Law [Syrian Arab Republic], Legislative Decree 276, 24 November 1969. Therefore, a person can have Syrian citizenship without ever setting foot in the country and a person who lives in Syria for their entire lifetime may not have Syrian citizenship.

. Honor killings, in which family members kill one of their own (usually a woman) under the belief that the murder is necessary to vindicate the family's honor, occur within societies of many faiths and, notably, in countries that were not subject to either Executive Order. See Kimberly Winston, Activists: Trump Call for Honor Killings Report Targets Muslims, USA Today (March 7, 2017, 3:06 PM), https://www.usatoday.com/story/news/ 2017/03/07/activists-trump-call-honor-killings-report-targets-muslims/98861230/ (saved as ECF opinion attachment).

. EO-1 also sought information on honor killings. See EO-1 § 10(a)(iii).

. I join in Part I of Judge Keenan's opinion, concluding that the plaintiffs possess standing to bring a claim under the INA.

. Immigrant visas are issued to persons seeking admission to the United States with the goal of obtaining lawful permanent residence status. See 8 U.S.C. §§ 1101(a)(15), (20), 1201(a)(1)(A). Those seeking admission for other purposes, such as business, study, or tourism, typically receive nonimmigrant visas. See id. §§ 1101(a)(15), 1201(a)(1)(B). I would decline Appellees' invitation to extend § 1152(a)(1)(A) to nonimmigrant visas.

. Indeed, Section 3 of EO-1, the predecessor to EO-2’s Section 2, was entitled “Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern.”